[No. B157178. Second Dist., Div. Seven. Feb. 25, 2003.]

GARY K. WOLF et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WALT DISNEY PICTURES AND TELEVISION, Real Party in Interest.

---

**COUNSEL**

Rintala, Smoot, Jaenicke & Rees, J. Larson Jaenicke, Michael B. Garfinkel and Heather M. Noelte for Petitioners.

No appearance for Respondent.

Akin, Gump, Strauss, Hauer & Feld, Martin D. Katz, Edward P. Lazarus and Ann B. Clark for Real Party in Interest.

---

**OPINION**

**PERLUSS, P. J.**—Petitioners Gary K. Wolf and his company Cry Wolf!, Inc. (hereinafter referred to collectively as Wolf), seek a writ of mandate to compel the trial court to vacate its order sustaining, without leave to amend, the demurrer of real party in interest, Walt Disney Pictures and Television (Disney), to Wolf's cause of action for breach of fiduciary duty. At issue is whether one contracting party's right to contingent compensation in the form of a percentage of future revenues in the control of the other contracting party creates a fiduciary relationship in an otherwise arm's length business transaction. Because a contingent entitlement to future compensation within the exclusive control of one party does not make that party a fiduciary in the absence of other indicia of a confidential relationship, we deny the request for a writ of mandate.

### FACTUAL AND PROCEDURAL BACKGROUND

The operative second amended complaint[1] alleges that Gary Wolf is the author of the novel entitled Who Censored Roger Rabbit? (1981). In or about August 1983, Wolf entered into a written agreement with Disney (the 1983

---

[1]Disney's demurrers to the breach of fiduciary duty claim in the original and first amended complaints were sustained with leave to amend.

Agreement)[2] in which Wolf assigned to Disney the rights to the novel and the Roger Rabbit characters.[3] In exchange for acquiring the rights, Disney agreed to pay Wolf a stated, fixed compensation upon execution of the agreement; a percentage of the "net profits," as defined by the parties, from a motion picture based on the novel;[4] and additional, contingent compensation in the amount of 5 percent of any future gross receipts Disney earned from merchandising or other exploitation of the Roger Rabbit characters. The 1983 Agreement provided that Disney was not "under any obligation to exercise any of the rights" granted to it and could assign or license any and all rights granted under the 1983 Agreement as Disney "s[aw] fit."

Disney then developed and coproduced, along with Steven Spielberg's Amblin Entertainment, a motion picture entitled Who Framed Roger Rabbit (1988) based upon Wolf's novel and its characters. After a dispute arose between Wolf and Disney regarding certain terms contained in the 1983 Agreement, the parties entered into a 1989 agreement that confirmed Wolf's entitlement to the contingent compensation set forth in the 1983 Agreement. In addition, the 1989 agreement granted Wolf certain audit rights.[5]

According to the complaint, each time Wolf attempted to exercise its audit rights, Disney failed to provide access to pertinent records. In addition, Disney allegedly underreported revenues it received in connection with the Roger Rabbit characters and failed to disclose the nature of its third party agreements concerning the characters and the compensation received. Wolf alleges such conduct not only constitutes a breach of contract but also amounts to a breach of fiduciary duty. Wolf claims that Disney is a fiduciary because Disney enjoyed "exclusive control over the books, records and information concerning the exploitation [of the Roger Rabbit characters] and the revenue and Gross Receipts Royalties derived therefrom."

The trial court sustained the demurrer to the fiduciary duty claim in the second amended complaint without leave to amend on the ground that "the contract between [Wolf] and [Disney] d[id] not create a fiduciary

---

[2]Disney notes the parties first entered into an option agreement in 1981. Because the complaint does not refer to the 1981 agreement, our analysis is limited to the 1983 Agreement and subsequent agreements identified in the operative second amended complaint.

[3]Certain limited publishing rights, which are not at issue in the underlying litigation, were exempted from the assignment.

[4]Payments under this provision are not at issue in this litigation.

[5]Like the previous agreement, the 1989 agreement included a provision that stated that "[n]othing herein contained shall be deemed to create a third party beneficiary agreement, nor a partnership or joint venture between [Disney] and [Wolf] . . . nor create a relationship between [Disney] and [Wolf] other than creditor-debtor."

relationship" as a matter of law.[6] After Wolf petitioned this court for a writ of mandate compelling the trial court to vacate its order sustaining without leave to amend the demurrer to the breach of fiduciary claim, we issued an order to show cause why the requested relief should not be granted.

## CONTENTIONS

Wolf contends its contingent entitlement to future compensation in the form of a percentage of revenues from Disney's exploitation of the Roger Rabbit characters, together with Disney's exclusive control over the information pertaining to such revenues, necessarily creates a fiduciary relationship.

## DISCUSSION

### 1. *Standard of Review*

In reviewing an order sustaining a demurrer, we independently review the complaint to determine whether the facts alleged state a cause of action under any possible legal theory. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We must give the complaint a reasonable interpretation, "treat[ing] the demurrer as admitting all material facts properly pleaded." (*Ibid.*) If the plaintiff demonstrates a reasonable possibility the complaint can be cured by amendment, it is an abuse of discretion for the trial court to sustain the demurrer without leave to amend. (*Ibid.*)

### 2. *The Trial Court Did Not Err in Sustaining Without Leave to Amend the Demurrer to the Breach of Fiduciary Duty Cause of Action*

A fiduciary relationship is " 'any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent. . . .' " (*Herbert v. Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220]; *In re Marriage of Varner* (1997) 55 Cal.App.4th 128, 141 [63 Cal.Rptr.2d 894]; see also *Rickel v. Schwinn Bicycle Co.* (1983) 144 Cal.App.3d 648, 654 [192 Cal.Rptr. 732] [" 'A

---

[6]Wolf's breach of contract cause of action based upon Disney's alleged withholding of pertinent records and underreporting of gross receipts is still pending in the trial court.

"fiduciary relation" in law is ordinarily synonymous with a "confidential relation." It is . . . founded upon the trust or confidence reposed by one person in the integrity and fidelity of another, and likewise precludes the idea of profit or advantage resulting from the dealings of the parties and the person in whom the confidence is reposed.' "].)

Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventurers, and agent/principal. (See, e.g., *Evangelho v. Presoto* (1998) 67 Cal.App.4th 615, 621 [79 Cal.Rptr.2d 146] [trustee and beneficiary]; *Jones v. H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108-109 [81 Cal.Rptr. 592, 460 P.2d 464] [controlling shareholder of corporation]; *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 818-819 [195 Cal.Rptr. 421] [joint adventurers]; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1580 [36 Cal.Rptr.2d 343] [agent/principal].)

Inherent in each of these relationships is the duty of undivided loyalty the fiduciary owes to its beneficiary, imposing on the fiduciary obligations far more stringent than those required of ordinary contractors. As Justice Cardozo observed, "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior." (*Meinhard v. Salmon* (1928) 249 N.Y. 458, 464 [164 N.E. 545, 546, 62 A.L.R. 1].)

Wolf concedes the complaint is devoid of allegations showing an agency, trust, joint venture, partnership or other "traditionally recognized" fiduciary relationship and further admits that the complaint cannot be amended to state facts alleging such a relationship. Nonetheless, he argues that the absence of a "traditionally recognized" fiduciary relationship is not dispositive on the question whether a fiduciary duty exists. Because Wolf's contractual right to contingent compensation necessarily required Wolf to repose "trust and confidence" in Disney to account for the revenues received, and because such revenues and their sources are in the exclusive knowledge and control of Disney, Wolf claims the relationship is "confidential" in nature and necessarily imposes a fiduciary duty upon Disney, at least with respect to accounting to Wolf for the gross revenues received.

a. *A Contingent Entitlement to Future Compensation Does Not, Alone, Give Rise to a Fiduciary Relationship.*

Contrary to Wolf's contention, the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create

a fiduciary relationship where one would not otherwise exist. (See, e.g., *Downey v. Humphreys* (1951) 102 Cal.App.2d 323, 332 [227 P.2d 484] [the obligation to pay money is a debt; "A debt is not a trust" and does not create a fiduciary relationship, "whether [debtor's] liability is certain or contingent"]; *Wiltsee v. California Emp. Com.* (1945) 69 Cal.App.2d 120, 125, 128 [158 P.2d 612] [employment contract entitling employee to 25 percent of future profits neither created a joint venture nor gave rise to a fiduciary relationship]; *New v. New* (1957) 148 Cal.App.2d 372, 381-382 [306 P.2d 987] [defendant's contractual obligation to pay former spouse a percentage of future monies received from stock holdings, if any, was no different than obligation to pay fixed monthly sum; though an implied duty of good faith and fair dealing existed in the contract, neither the contingent nature of the debt nor the debtor's exclusive control of monies received created a fiduciary relationship].)

Equally without merit is Wolf's contention that a fiduciary relationship exists because he necessarily reposed "trust and confidence" in Disney to perform its contractual obligation—that is, to account for and pay Wolf the contingent compensation agreed upon in the contract. Every contract requires one party to repose an element of trust and confidence in the other to perform. For this reason, every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from " 'doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .' " (*Nelson v. Abraham* (1947) 29 Cal.2d 745, 751 [177 P.2d 931] (*Nelson*); *New v. New, supra,* 148 Cal.App.2d at pp. 382-383.) "Being of universal prevalence, [the implied covenant] cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all." (*New v. New, supra,* 148 Cal.App.2d at pp. 382-383.)

### b. *The Profit-sharing Aspect of an Agreement Alone Does Not Give Rise to a Fiduciary Relationship.*

Wolf cites a number of cases for the proposition that profit- or revenue-sharing agreements are inherently fiduciary in nature. None of them, however, supports its claim. For example, in *Nelson, supra,* 29 Cal.2d 745, the court addressed whether an agreement to share the profits of the operation of the business, though without an equity interest in the business, gave rise to a fiduciary obligation in the absence of a partnership. Distinguishing an agreement to share profits that "is merely to provide a measure of compensation for services or the use of money" from one that "extends beyond and bestows ownership and interest in the profits themselves" (*id.* at p. 750), the court held that it was the plaintiff's "effort, skill, management and tact" that

was "pertinent in determining the nature of the relationship of the parties and in defining the correlative rights and duties flowing from a contract which gave to the plaintiff a share in the net profits from operation." (*Id.* at p. 752.) In rejecting the defendant's claim that the plaintiff was not entitled to profits because no partnership had been formed, and finding instead an obligation to share and to account for profits, the court held that it was "unnecessary to place a precise legal designation on the relationship" because the respective obligations imposed on the parties in the contract showed at least a joint venture giving rise to a fiduciary obligation. (*Id.* at p. 750.)

*Stevens v. Marco* (1956) 147 Cal.App.2d 357 [305 P.2d 669] (*Stevens*), also cited by Wolf, is similarly unavailing. In *Stevens,* the plaintiff agreed to assign his invention to the defendant, who in turn, agreed to secure patent protection and to give the plaintiff a percentage of the net revenues from the product's sales. (*Id.* at p. 363.) Their agreement further provided that the plaintiff would continue to work on improvements and assign any interest in such improvements to the defendant, and in turn, would receive a percentage of the revenues from any improvement made by either party. Reversing a nonsuit and explaining that the plaintiff had stated facts potentially establishing a fiduciary relationship thereby shifting the burden of proof, the court observed, "Where an inventor entrusts his secret idea or device to another under an arrangement whereby the other party agrees to develop, patent and commercially exploit the idea in return for royalties to be paid the inventor, there arises a confidential or fiduciary relationship. [Citations.] Indeed, it would be difficult to postulate a relationship more confidential than one in which a secret is imparted to a person professing to have the ability and facilities to develop, patent and exploit it upon his promise to give the inventor a return in the form of royalties." (*Id.* at p. 373.) At a minimum, the court explained, there were sufficient facts for a jury to find that "the parties were allied in an enterprise *similar* to that of joint venturers for mutual gain. The royalty agreements between the parties [were] not . . . merely 'a contract of assignment and sale[,' but] plainly indicated that [defendant] was to exploit and develop the use of the patents for their *joint profit* and that any subsequent improvements made by either would accrue to their *mutual benefit.*" (*Id.* at p. 374, italics added.)

In contrast to the facts in *Nelson* and *Stevens,* there are no allegations in the instant complaint of the formation of a joint venture or a relationship "akin" to a joint enterprise. To the contrary, the agreement created a debtor/creditor relationship, expressly providing that in exchange for compensation, both certain and contingent, Disney, as the new owner of the rights, could exploit those rights or not exploit them as it saw fit. Disney was under no obligation to maximize profits from the enterprise or obtain Wolf's

approval for its contracts. (Cf. *Kirke La Shelle Co. v. Paul Armstrong Co.* (1933) 263 N.Y. 79, 82 [188 N.E. 163, 164-165] [agreement gave plaintiff not only right to percentage of proceeds but also approval rights over every subcontract "affecting" plaintiff's rights].) Instead, in authorizing Disney to use those rights as it saw fit, the contract plainly allowed an opportunity for nonmutual profit that is absent in fiduciary relationships. (See *Rickel v. Schwinn Bicycle Co.*, *supra*, 144 Cal.App.3d at pp. 653-655 [bicycle dealer who had agreement with manufacturer to share proceeds from sales of manufacturer's product was not a fiduciary, where bicycle dealer not obligated to sell manufacturer's products and was free under the agreement to recommend sale of competitor's brands].)

Trying to fit its complaint within the principles articulated in *Nelson* and *Stevens,* Wolf argues that a fiduciary duty exists because Disney's exploitation of the characters, if profitable, would inure to the parties' joint benefit. Yet even distribution agreements, negotiated at arm's length, do not create a fiduciary relationship between the product's owner and the distributor even though both parties stand to benefit from the distributor's sales of the product. (*Rickel v. Schwinn Bicycle Co.*, *supra*, 144 Cal.App.3d at pp. 653-655; *Recorded Picture Company* [*Production*] *Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 370 [61 Cal.Rptr.2d 742]; *Waverly Productions, Inc. v. RKO General, Inc.* (1963) 217 Cal.App.2d 721, 732-734 [32 Cal.Rptr. 73] (*Waverly*).) If those agreements, where no ownership rights over property are transferred, do not create a fiduciary relationship, neither do contracts, such as the one between Wolf and Disney, involving the sale of all rights to the new owner to exploit as it sees fit. (See *Rickel*, at pp. 653-655.)

> c. *Wolf's Contractual Right to an Accounting Does Not Create a Fiduciary Relationship.*

Relying on *Waverly*, Wolf alternatively argues that fiduciary duties exist with respect to Disney's obligation to provide an accounting even though the relationship itself is not otherwise fiduciary in character. In *Waverly,* a distribution company (RKO) entered into an agreement with a producer to distribute two of the producer's motion pictures. The distributor then entered into sublicensing agreements with foreign distributors. The producer sued RKO, claiming RKO breached its fiduciary duty by subcontracting the distribution duties to foreign distributors who made little or no effort to distribute the films. Rejecting the producer's claim that the distributor was a fiduciary, the court held, "The [distribution] contract is an elaborate one which undertakes to define the respective rights and duties of the parties . . . . . A mere contract or a debt does not constitute a trust or create a

fiduciary relationship." (*Waverly*, *supra*, 217 Cal.App.2d at pp. 731-732.) Noting that the trial court had correctly held that although not a fiduciary, RKO did have an obligation to account to the producer for rentals received from its sublicensees (*id.* at p. 731), the court also stated its holding in the following language: "We think it clear that RKO was not a fiduciary with respect to the performance of the terms of this contract (except as to accounting for rentals received) and that arguments predicated on the assumption that it was are directed to a false issue." (*Id.* at p. 734.)

Seizing on the court's parenthetical reference to RKO's obligation to provide an accounting, Wolf argues that *Waverly* acknowledged the existence of a fiduciary relationship between the distributor and the producer with respect to the accounting that applies equally to issues surrounding Disney's contractual obligation to account to Wolf, even if their contract does not otherwise create a fiduciary relationship. Wolf misapprehends the import of the *Waverly* court's recognition of the producer's right to an accounting of proceeds received from subdistributors. Either a relationship is fiduciary in character or it is not. Whether the parties are fiduciaries is governed by the nature of the relationship, not by the remedy sought. *Waverly* recognized simply that RKO had a duty to account, not that RKO was a fiduciary with respect to its accounting obligation.[7]

The duty to provide an accounting of profits under the profit-sharing agreement in *Waverly* is appropriately premised on the principle, also expressed in *Nelson,* that a party to a profit-sharing agreement may have a right to an accounting, even absent a fiduciary relationship, when such a right is inherent in the nature of the contract itself. As the court in *Nelson* observed, the right to obtain equitable relief in the form of an accounting is not confined to partnerships but can exist in contractual relationships requiring payment by one party to another of profits received. That right can be derived not from a fiduciary duty, but simply from the implied covenant of good faith and fair dealing inherent in every contract, because without an accounting, there may be no way " 'by which such [a] party [entitled to a share in profits] could determine whether there were any profits . . . .' " (*Nelson, supra,* 29 Cal.2d at p. 751, quoting *Kirke La Shelle Co. v. Paul Armstrong Co., supra,* 263 N.Y. 79; see also *Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 14 [135 Cal.Rptr. 915] [action for accounting is equitable in nature and may be brought to compel the defendant to account for money where a fiduciary relationship exists, or " 'where

---

[7]Similarly the holding in *Schaake v. Eagle etc. Can Co.* (1902) 135 Cal. 472, 485 [67 P. 759], upon which Wolf also relies, is simply that a breach of contract claim by an inventor who assigned patents to his corporate employer while reserving an interest in profits "is a proper case for an accounting . . . ."

. . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable' "].) Here, the parties do not dispute that the contract itself calls for an accounting. That contractual right, however, does not itself convert an arm's length transaction into a fiduciary relationship.

 d. *The Need to Shift the Burden of Proof in Profit-sharing Cases Does Not Create a Fiduciary Relationship.*

Wolf's final argument for finding a fiduciary relationship based on Disney's contingent obligation to pay future compensation rests on the practical assessment that, without such a finding and the corresponding shift in the burden of proof that such a relationship affords (see, e.g., *Rosenfeld, Meyer & Susman v. Cohen* (1987) 191 Cal.App.3d 1035, 1051 [237 Cal.Rptr. 14]), Wolf will be unable to prove any breach by Disney because all information regarding the proper calculation of contingent compensation is within Disney's exclusive control. Wolf asserts that this total dependence on financial information from Disney demonstrates that it has reposed trust and confidence in the integrity and fidelity of Disney, thereby establishing a fiduciary relationship.

We agree with Wolf that, in contingent compensation and other profit-sharing cases where essential financial records are in the exclusive control of the defendant who would benefit from any incompleteness, public policy is best served by shifting the burden of proof to the defendant, thereby imposing the risk of any incompleteness in the records on the party obligated to maintain them. ▮ Ordinarily, "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting," but this rule applies only "[e]xcept as otherwise provided by law." (Evid. Code, § 500.) On occasion courts have held that, " 'Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim.' " (*Sanchez v. Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 71 [141 Cal.Rptr. 146, 569 P.2d 740].)

"In determining whether the normal allocation of the burden of proof should be altered, the courts consider a number of factors: the knowledge of the parties concerning the particular fact, the availability of the evidence to the parties, the most desirable result in terms of public policy in the absence of proof of the particular fact, and the probability of the existence or nonexistence of the fact. In determining the incidence of the burden of proof, 'the truth is that there is not and cannot be any one general solvent for all

cases. It is merely a question of policy and fairness based on experience in the different situations.' " (Cal. Law. Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 500, p. 554; *Sanchez v. Unemployment Ins. Appeals Bd.*, *supra*, 20 Cal.3d at p. 71; see also 1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 12, p. 165 ["[B]urden of proof may also be altered [under Evidence Code section 500] where there is a greater or almost exclusive availability of evidence to one party"]; *Webster v. Trustees of Cal. State University* (1993) 19 Cal.App.4th 1456, 1463 [24 Cal.Rptr.2d 150].)

 In cases where the financial records essential to proving the contingent compensation owed are in the exclusive control of the defendant, fundamental fairness, the "lodestar" for analysis under Evidence Code section 500 (*Adams v. Murakami* (1991) 54 Cal.3d 105, 119 [284 Cal.Rptr. 318, 813 P.2d 1348]), requires shifting the burden of proof to the defendant. In such cases, the essential facts as to the contingency and the amount owed lie in the exclusive knowledge and control of the defendant, placing the defendant in a far better position to prove satisfaction of its payment obligation. (See, e.g., *Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1717 [34 Cal.Rptr.2d 265] ["the burden of proving an element of a case is more appropriately borne by the party with greater access to information"].) Imposing the burden of proof on a defendant to prove it has fulfilled its payment obligations to plaintiff in these types of contract cases, moreover, is consistent with the long-standing rule that a debtor defending a lawsuit to recover money under a promissory note bears the burden of proving that its payment obligation has been satisfied. (See, e.g., *Roesch v. De Mota* (1944) 24 Cal.2d 563, 569 [150 P.2d 422]; *Pacific States Sav. & L. Co. v. Painter* (1940) 37 Cal.App.2d 645, 647 [99 P.2d 1103].)

Although we therefore agree that the burden of proving a plaintiff has been paid contingent compensation in accord with the parties' agreement is properly placed on a defendant in exclusive control of essential financial records (thereby imposing on the defendant the risk of any incompleteness in such records), this determination regarding evidentiary burdens does not alter the contractual nature of the parties' relationship. Considerations of fairness and practicality, while relevant to an analysis under Evidence Code section 500, cannot serve to create a fiduciary relationship where one does not otherwise exist.

## DISPOSITION

The petition for writ of mandate is denied. Each party to bear his and its own costs.

Woods, J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I agree with that portion of part 2.d. of the majority opinion suggesting the burden of proof will shift to Disney with respect to whether it accurately reported and paid Wolf the full royalties owed for its exploitation of Wolf's characters. In my view, this holding as a practical matter cures much of Wolf's concern about the difficulty of proving the remainder of his case in the face of possible lost, destroyed, or inadequate records.

I write separately, however, to register my disagreement with the majority opinion affirming the trial court's order sustaining a demurrer to Wolf's breach of fiduciary duty cause of action. This ruling is based on a finding Disney owed no fiduciary duty, *as a matter of law,* to accurately and honestly account to Wolf for his 5 percent share of the gross receipts attributable to the company's exploitation of Wolf's intellectual product. Unavoidable circumstances already have delayed unduly the issuance of our opinion, and also required decision by a partially reconstituted panel in this writ proceeding. I thus will keep this dissent brief, even though it raises some fundamental issues.

I tend to agree with the majority opinion's conclusion *Waverly Productions, Inc. v. RKO General, Inc.*[1] is too slender a reed on which to hang a decision holding Disney had a fiduciary duty to Wolf with respect to its responsibility to provide an honest and accurate accounting. The reference in the *Waverly* opinion is ambiguous and lacks an articulated rationale. I am less persuaded by the attempt to distinguish other authorities tending to support Wolf's position, however.[2]

---

[1] *Waverly Productions, Inc. v. RKO General, Inc.* (1963) 217 Cal.App.2d 721 [32 Cal.Rptr. 73].

[2] For instance, in a modification to its original opinion, the majority opinion characterizes *Schaake v. Eagle etc. Can Co.* (1902) 135 Cal. 472 [67 P. 759], as merely holding an employee who assigned his patents to his employer in return for a percentage of the profits is entitled to an accounting. But the Supreme Court went beyond that to declare a fiduciary relationship had been created. "These patents and improvements were assigned to the corporation by the plaintiff, but reserving an interest in certain profits which might be realized by the corporation. The relation thus created was *fiduciary,* and as to plaintiff's share or part of the profits realized the *corporation was a trustee.*" (*Id.* at p. 485, italics added.)

In essence, the Supreme Court ruled the plaintiff inventor had a right to an accounting of net profits earned on his inventions specifically *because* the corporation exploiting those inventions owed him a fiduciary duty. The accounting was merely a remedy flowing from the duty, but not necessarily the only remedy or other consequence flowing from that duty. Admittedly, lesser, nonfiduciary relationships sometimes also can create a right to the remedy of an accounting. But the Supreme Court in *Schaake* expressly founded the right to that remedy on a finding the assignment of the plaintiff's intellectual property to a corporation and giving the corporation the right to exploit that intellectual property in return for a share of the profits imposed a fiduciary duty on the corporation. This fiduciary duty, in turn, made the corporation a trustee of the intellectual property holder's share of the profits. I am not

But in any event, there remains the question whether there *is or should be* such a fiduciary duty, and under what circumstances, when two parties enter into a profit-sharing relationship but one of those parties retains full control over the books. This issue, in turn, depends on whether the other party's right to audit the books provides a strong enough incentive to ensure an honest report of those receipts and profits. Or does it require imposition of a fiduciary duty and the threat of the attendant remedies to encourage a proper performance of this critical responsibility?

The majority opinion implies there can be no fiduciary duty to keep honest and accurate books—and none of the traditional remedies enforcing such a duty—unless the relationship between the two parties is a fiduciary

persuaded the relationship between the intellectual property holder here, Wolf, and the corporation contracting to exploit his intellectual property, can be properly distinguished from the relationship found sufficient to create a fiduciary duty in *Schaake,* which furthermore would turn Disney into a trustee of Wolf's share of the proceeds from exploitation of his characters.

Similarly, it is questionable whether the majority opinion successfully distinguishes *Nelson v. Abraham* (1947) 29 Cal.2d 745 [177 P.2d 931] and *Stevens v. Marco* (1956) 147 Cal.App.2d 357 [305 P.2d 669]. Wolf is not suing Disney for failing to exploit Roger Rabbit and his other characters, or for having pushed Mickey Mouse and Donald Duck characters more vigorously than his characters. As a result, such differences as may exist between the relationships described in the *Nelson* and *Stevens* cases and the relationship here seem largely irrelevant as to the fiduciary duty to accurately and honestly report Wolf's share of the earnings on the gross sales from exploitation of his characters. (Incidentally, in neither *Nelson* nor *Stevens* did the defendant promise not to contract with other persons or products that might compete with the plaintiff.)

Both *Nelson* and *Stevens* identified a number of factors which can combine to create a fiduciary duty flowing from one party to another. Most of those factors are present here, while some are not. But significantly, some of the factors mentioned in *Stevens* are not present in *Nelson,* and vice versa. Yet each found a relationship sufficient to create a fiduciary duty, including a duty to honestly and accurately account to the plaintiff for his share of the profits.

Notably, contrary to the majority's characterization of these decisions, each of these courts found such a relationship without determining it was limited to a joint venture or even an "enterprise similar to a joint venture." Furthermore, each held these profit-sharing relationships were enough to impose a duty on the party keeping the books to honestly and accurately report and to pay over the other party's share of the proceeds. In *Stevens,* for example, after pointing out all the indicia existed to sustain a finding of a fiduciary relationship without a particular label, the court went on to state: "*Furthermore,* the jury *might also have found,* . . . that the parties were allied in an enterprise similar to that of joint venturers for mutual gain." (*Stevens v. Marco, supra,* 147 Cal.App.2d at p. 374, italics added.) The opinion then marshals the evidence supporting that alternative finding. But the finding of a joint venture or an enterprise similar to a joint venture was not essential to its holding. And *Nelson* expressly disavows the need for any label. "It is, however, unnecessary to place a precise legal designation on the relationship between the parties. The present controversy is between the parties to a contract by which the plaintiff admittedly became entitled to a one-third share of the net profits from the operation without acquiring an interest in the business." That was enough to impose a fiduciary duty to honestly and accurately report the net profits "without the necessity for designating their relationship by a particular label." (*Nelson v. Abraham, supra,* 29 Cal.2d at p. 750.)

relationship for all purposes. (Maj. opn., *ante,* at p. 34.) The majority argues the relationship defined in this contract falls short of being a joint venture, largely because Disney lacks a contractual duty to exploit any of Wolf's figures or other intellectual property, and thus does not qualify as a fiduciary relationship. Consequently, according to the majority rationale, Disney owes no fiduciary duty to maintain honest accounts even as to the exploitations of Wolf's intellectual property it does choose to undertake. (Maj. opn., *ante,* at pp. 31-33.)

I differ with the majority opinion on both counts.

First, in my view, evidence may develop establishing Disney and Wolf were involved in a joint venture—at least, a contingent joint venture and one which Disney elected to activate—despite any language in the contract to the contrary. Intellectual property is not the same as "widgets" and cannot be treated as such. Whether a joint venture exists is to be determined from the statements and conduct of the parties, not just the written contract they may have executed as part of the venture.[3] Thus, with rare exceptions, this issue cannot be decided on demurrer based on an interpretation of such a written contract.

Furthermore, no amount of contractual disclaimers avowing this was a debtor-creditor relationship instead of a joint venture can turn it into something it was not. As this court held 20 years ago, "[T]he conduct of the parties may create a joint venture despite an express declaration to the contrary."[4] So if it hops like a rabbit and has big floppy ears like a rabbit and eats carrots like a rabbit, Roger is a rabbit—even if the contract says he is a duck (or a mouse).

This arrangement had some key attributes of a joint venture, at least once Disney elected to make the movie starring "Roger Rabbit," and then to exploit the characters in other ways.[5] Later in the proceeding, evidence may emerge demonstrating that once Disney decided to make the movie and

---

[3]*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 819 [195 Cal.Rptr. 421] (neither characterization of holder of intellectual property as "independent contractor" in his contract with a television station nor the integration clause in that contract foreclosed parol evidence of oral statements or conduct from which a trier of fact could infer the existence of a joint venture).

[4]*April Enterprises, Inc. v. KTTV, supra,* 147 Cal.App.3d at page 820, citing *Universal Sales Corp. v. California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 765 [128 P.2d 665].

[5]The facts of this case, as best we know them at this stage, resemble *April Enterprises, Inc. v. KTTV, supra,* 147 Cal.App.3d 805. That case involved what this court held could prove to be a contingent joint venture between a television station and the ventriloquist who had created several characters and starred in the station's series based on those characters. The contract provided that if the station managed to exploit the filmed series of television shows via syndication or otherwise the ventriloquist would receive a percentage of the revenues. This court deemed the arrangement could qualify as a joint venture, depending on the

exploit the characters Wolf created, the two of them embarked on a joint venture. If so, Disney would owe a fiduciary duty to its co-adventurer even though the terms of the written contract did not define a joint venture and despite the fact Disney had managed to insert contract language asserting this was only to be a debtor-creditor relationship.

Second, even if the arrangement ultimately fails to qualify as a true joint venture that does not end the matter. Disney does not necessarily escape a fiduciary duty to honestly and accurately account to the author of the intellectual property for the receipts earned from the intellectual property on which that author's compensation is based. Under the terms of this contract, Disney undertook the accounting responsibility for the author as well as itself—a responsibility arguably carrying with it a fiduciary duty to accurately and honestly report the true receipts and profits. Accountants, like lawyers, owe a fiduciary duty to their clients.[6] Accountants also owe a duty not to supply negligently or intentionally false information to nonclients who the accountant knows with substantial certainty will rely on that information in their dealings with the client.[7]

Disney may not be an accounting firm, but it employs the accountants and bookkeepers who perform the accounting function Disney contracted to carry out. In a very real sense, Disney *is* Wolf's accountant with respect to the complete and accurate and honest maintenance of the books as to any transactions involving exploitation of Wolf's characters. That itself may create a fiduciary relationship. (Or, alternatively Disney is simultaneously occupying the roles of both accountant and client. In that case, in its role as accountant it is duty bound not to supply negligently or intentionally false information to Wolf, who obviously is a third person known to be relying on that information in its dealings with Disney in the latter's role as client.)

In either event, contrary to a bank-depositor relationship or many other relationships where one business entity maintains records for another, in this

evidence produced at trial, despite the absence of a promise or affirmative duty on the part of the station to exploit the ventriloquist's past television shows and even though the ventriloquist was not to share in any losses that might be incurred in the attempt to exploit his shows. Some years after the contract was signed the station negligently or deliberately destroyed the only copies of the filmed programs. The published opinion reversed a judgment on the pleadings and nonsuit the trial court had granted in the station's favor. In a subsequent unpublished opinion, this division upheld a multimillion-dollar jury verdict based on the station's breach of the fiduciary duty it owed its joint adventurer, the ventriloquist. Although the facts are not identical to the Wolf-Disney arrangement, the parallels are fairly close.

[6]See generally 6 Witkin, Summary of California Law (9th ed. 1988) Torts, section 805, page 157 ("Like other professionals . . . ., accountants 'have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence.' [Citation.]").

[7]*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 414 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835].

instance Wolf necessarily depended entirely on Disney's accounting department and the other Disney employees providing raw information to that department. He was not able to "reconcile" his checkbook based on his own records, or the equivalent. Nor was Wolf in a position to verify the accuracy and completeness of the raw data—the true gross receipts from exploitation of his characters—purportedly recorded in the reports he received. Even if the contract by its terms is ambiguous on this issue, evidence may well develop during the course of these proceedings demonstrating Disney's promise to perform this function created a fiduciary relationship—in this instance, a fiduciary relationship limited to the accounting aspect of the total relationship between Disney and Wolf.

Certainly, Disney's contractual duty to maintain the books required to accurately record the moneys it receives from exploitation of Wolf's characters possesses many of the attributes that have led the courts to characterize other relationships as fiduciary in nature. As one leading commentator wrote in describing what justifies the imposition of fiduciary duties: "Because fiduciaries manage or have some control over very substantial property interests of others, they have the potential to inflict great losses on those property owners. [The] economic interests of fiduciaries are frequently substantially affected by the discretionary decisions they make on behalf of others . . . As a result . . . *fiduciaries have unusually great opportunities to cheat without detection and they have unusually great incentives to do so.* Moreover, the relative costs which their cheating may impose on those whose property they manage are frequently much greater than the relative costs that can be imposed without detection or remedy in simpler contractual exchanges."[8]

"Fiduciary duties and conflict of interest regulation both provide standardized terms to minimize transaction costs and impose unwaivable quality requirements which *prevent fiduciaries from taking unfair advantage of the superior bargaining power* resulting from their specialized information and skills."[9]

The opportunity and temptation to cheat are present in the relationship here just as much as in the trustee-beneficiary, partnership, or other traditional fiduciary relationships. Wolf must depend entirely on the honesty and accuracy of Disney in the performance of the accounting function Disney is carrying out for both of them. Every sale of a toy "Roger Rabbit" that Disney fails to include in its report of receipts from exploitation of

---

[8]Anderson, *Conflicts of Interest: Efficiency, Fairness and Corporate Structure* (1978) 25 UCLA L.Rev. 738, 758, italics added.

[9]Anderson, *Conflicts of Interest: Efficiency, Fairness and Corporate Structure, supra*, 25 UCLA L.Rev. at page 759, italics added.

Wolf's characters means less money for Wolf and more profit for Disney. The conflict of interest inherent in this relationship, therefore, is more than apparent. So there appears to be just as great a need to impose a fiduciary duty on the performance of that accounting responsibility in order to discourage Disney "from taking unfair advantage of" its special position as there is for partners who manage a partnership business or for trustees who keep the books for a beneficiary's property interests.

Almost 70 years ago in the midst of a depression and contemplating the ruins of a collapsed economy, the nation's future Chief Justice, Harlan Stone, made a powerful argument for imposing fiduciary duties where one party depends on the honest performance of another who may have a selfish motive for doing otherwise.

"I venture to assert that when the history of the financial era which has just drawn to a close comes to be written, most of its mistakes and its major faults will be ascribed to the failure to observe the fiduciary principle, the precept as old as holy writ, that 'a man cannot serve two masters'. More than a century ago equity gave a hospitable reception to that principle and the common law was not slow to follow in giving it recognition. No thinking man can believe that an economy built upon a business foundation can permanently endure without some loyalty to that principle."[10]

Recent events have made Justice Stone's admonition all the more relevant not only to the current business world, but also to the courts and especially in regard to our decisions whether to impose fiduciary duties on certain business relationships. On the record before our court in this writ proceeding, I am not quite prepared to determine Disney assumed a fiduciary duty to maintain honest and accurate records as to its exploitation of Wolf's characters. But I am close to such a conclusion. More importantly, I am unprepared at this early stage of the proceedings, in the absence of evidence before the trial court, to determine no such fiduciary duty exists as a matter of law. Accordingly, I would issue the writ and reverse the order sustaining the demurrer, thus reserving that question for another day.

On March 20, 2003, the opinion was modified to read as printed above. Petitioners' petition for review by the Supreme Court was denied May 14, 2003. George, C. J., and Brown, J., did not participate therein.

---

[10]Stone, *The Public Influence of the Bar* (1934) 48 Harv. L.Rev. 1, 8-9.