**L–3 COMMUNICATIONS CORPORATION, Plaintiff–Counter–Defendant/Appellant–Cross–Appellee,**

v.

**OSI SYSTEMS, INC., Defendant–Counterclaimant/Appellee–Cross–Appellant.**

Nos. 07–1314–cv(L), 07–1552–cv(xap).

United States Court of Appeals, Second Circuit.

June 27, 2008.

Donald B. Verrilli, Jr., (Ian Heath Gershengorn, Elaine J. Goldenberg, Ginger D. Anders, Melissa A. Meister, Jessica Ring Amunson, of counsel) Jenner & Block LLP, Washington, D.C., Preeta D. Bansal, Shelia L. Birnbaum, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Appellant–Cross–Appellee.

Carter G. Phillips (Paul J. Zidlicky, Rick A. Kaplan, John J. Kuster, Martin B. Jackson, Nicholas K. Lagemann, Howard J. Rubinroit, Bridget S. Johnsen, of counsel) Sidley Austin LLP, Washington, D.C., for Appellee–Cross–Appellant.

Present: Hon. RICHARD J. CARDAMONE, Hon. JOSÉ A. CABRANES, and Hon. ROBERT A. KATZMANN, Circuit Judges.

## SUMMARY ORDER

### BACKGROUND

L–3 Communications Corporation appeals from the March 2, 2007 judgment of the district court awarding OSI Systems, Inc., $33 million in compensatory damages and $96 million in punitive damages on its claims of fraud and breach of fiduciary duty. OSI cross appeals from the district court's denial of its request to impose a constructive trust. We assume the parties' familiarity with the facts, procedural history, and specification of issues on appeal and recount them only to the extent necessary to explain our decision.

In the fall of 2001, L–3 and OSI, both major suppliers of security detection machines used in airports and government buildings, became interested in acquiring parts of the security detection business of a third company, PerkinsElmer, Inc. (PEI). PEI had announced plans to spin

off four business lines: (1) "conventional" products like x-rays and metal detectors, which require human operators, (2) "automated" products like computerized baggage screeners that do not need human operators, (3) "cargo" products including larger machines for scanning cargo containers, and (4) "ARGUS," a government contract program to develop low cost automated scanners for small airports. L–3 was primarily interested in the automated and cargo lines. OSI was primarily interested in the conventional and ARGUS lines.

In October 2001, OSI's president and CEO, Deepak Chopra, approached L–3 about working together to acquire and then divide the PEI business. Subsequently, he met with L–3's CEO, Frank Lanza, and, over the course of the next month, the two of them negotiated a nonbinding letter of intent outlining the framework of their proposed deal. The letter of intent, which they executed on November 27, 2001, stated that L–3 and OSI had agreed in principle to form a new entity (or use such other structure as deemed appropriate) to acquire the PEI business lines for a price of up to $85 million with each company contributing half of the purchase price to the new entity. If the price exceeded $85 million, OSI would have the option to participate or withdraw, and only if OSI elected not to participate could L–3 proceed alone. As soon as possible after acquiring the PEI business, L–3 and OSI would dissolve the new entity and divide up the business with the automated and cargo lines going to L–3 and the conventional and ARGUS lines going to OSI. The letter of intent was

made explicitly non-binding, with the exception of binding requirements (1) to negotiate in good faith and (2) that neither party could cooperate with any third party to submit a bid for the PEI business or act alone to submit a separate bid for the business unless the price exceeded $85 million and OSI did not desire to contribute half of the purchase price. Throughout their dealings with each other, both of these sophisticated corporations were represented by counsel.

On November 28, 2001, one day after L–3 and OSI executed the letter of intent and one day before the bid was due to PEI, Lanza spoke with Chopra and told him that based on his experience doing acquisitions, he thought the bid would be stronger if it was in L–3's name alone because PEI would want to negotiate with one party instead of having to deal with a joint bid. OSI initially resisted the idea (and under the binding terms of the letter of intent, OSI could have prevented L–3 from submitting the bid in its name alone), but Lanza made a series of statements to Chopra that ultimately persuaded him to agree to L–3 fronting the bid. It was undisputed on summary judgment that Lanza told Chopra: (1) "even if OSI wasn't on the contract and wasn't in the negotiations, it would be · treated fairly," (2) that L–3 would take OSI's views into account during negotiations with PEI, and (3) that if the bid succeeded, L–3 intended to abide by the rest of the terms of the original letter of intent. In his deposition testimony, Lanza said that his understanding of what he agreed to was that "L–3 would be negotiating both on behalf of itself and on behalf of OSI." [1] The parties did not, how-

---

1. Lanza's testimony at trial was along the same lines. He testified: "I agreed I had an obligation to protect [Chopra's] company and my company, in all fairness, and I agreed to do that and I did all I could in that year.... I

knew that personally I had made a handshake with the man to do what I was going to do and I was going to do it as well to protect his company as well as our company." He also testified: "The only thing that was binding to

ever, reduce any of these understandings to writing. Chopra insisted that OSI's involvement should at least be acknowledged in the cover letter for the bid and the parties agreed that the cover letter would read: "L–3 Communications Corporation ('L–3'), together with its exclusive partner OSI Systems, Inc., ('OSI') is pleased to submit this proposal for the acquisition of the detection systems business [of PEI]."

L–3 submitted the bid in its name only (along with the requested cover letter), and PEI was displeased at receiving what it perceived to be a joint bid. PEI responded, saying it would negotiate only with L–3. OSI acquiesced to this arrangement and L–3 kept OSI informed about the contract negotiations to some extent and sought its comments on contract drafts. The parties had originally intended that the division of the PEI business lines would occur simultaneously with the closing of the purchase agreement, but PEI insisted that L–3 could not enter into any agreement to divide the business until after the PEI/L–3 transaction closed. Although OSI objected to this term, L–3 and PEI signed a purchase agreement on December 24, 2001 for a purchase price of $100 million.

The acquisition was subject to antitrust review by the U.S. Department of Justice, and the purchase agreement provided that L–3 remained responsible for the full $100 million even if the transaction did not receive government approval. The Department of Justice approved the transaction in June 2002 and the deal closed on June 14, 2002. L–3 paid PEI $100 million plus $10 million in post-closing adjustments and

acquired all four business lines. OSI paid nothing.

Negotiations over how to divide up the business lines turned out to be more difficult than anticipated because there was some overlap between PEI's business divisions. One particular sticking point was what to do with patents and other intellectual property covering technologies used in both the automated and conventional lines. Moreover Joseph Paresi, the president of L–3's security detection division and the "point person" on the L–3 side, was openly hostile to the idea of transferring the conventional and ARGUS lines to OSI. At times he even appeared to be actively trying to undermine the transaction. Although he was, on occasion, overruled by Lanza and L–3's senior management, Paresi nevertheless remained the point person on the deal with OSI.

After the L–3/PEI transaction closed, L–3 and OSI executed an amended letter of intent on August 13, 2002 to facilitate antitrust review and to reflect the fact that L–3 now owned the PEI business lines and wished to sell the conventional and ARGUS lines to OSI for $50 million. Like the original letter of intent, the amended letter of intent was expressly made non-binding except for the obligation to negotiate a definitive agreement in good faith. On the same day, the parties also executed a confidentiality agreement that stated explicitly that other than the confidentiality agreement, "no legal or equitable duties, responsibilities or rights are created hereby, and no contract, agreement or other binding commitment providing for any transaction … shall be deemed to exist between [the parties] unless and until a

me was that [Chopra] and I agreed to make a deal on the company and he would take conventional. That is what was binding to me and him and I had an obligation in all fair-

ness to make sure he got it. That is what was binding to Frank Lanza, that I would make sure that I did nothing to jeopardize him buying the conventional business he wanted."

final definitive agreement has been executed and delivered."

Relations between the parties further deteriorated in October 2002. Paresi sent OSI a list of open business issues, essentially taking the position that no conventional or ARGUS products incorporating intellectual property from the automated line should go to OSI—a position OSI found untenable. In subsequent telephone calls, other L–3 executives agreed that OSI would get all of the of the conventional and ARGUS products as originally contemplated and that they would work out how to deal with the intellectual property issues later. But apparently these concessions were not enough for OSI and OSI inquired as to whether L–3 would be willing to pay a $10 million break-up fee to terminate negotiations; L–3 refused. A week later, OSI sent a memorandum to L–3 insisting that any intellectual property that had migrated from the automated line to the conventional or ARGUS lines should be co-owned by both companies with no restrictions on use. L–3 found this proposal untenable and negotiations fell apart completely.

In November 2002, L–3 filed an action in the Southern District of New York for a declaratory judgment that it had fulfilled its obligation under the amended letter of intent to negotiate in good faith. OSI counterclaimed for breach of contract, breach of fiduciary duty, fraud, and constructive fraud, claiming that L–3 had never intended to transfer the two business lines to OSI, and it sought compensatory and punitive damages as well as imposition of a constructive trust. The parties cross-moved for summary judgment. The district court (Chin, *J.*) granted partial summary judgment in favor of OSI on its fiduciary duty claim, concluding as a matter of law that L–3 owed OSI a fiduciary duty. Although the parties had not entered into any of the formal legal relationships that typically entail fiduciary duties, the district court found, as a matter of law, that because L–3 agreed to submit the bid to PEI on behalf of both parties and, as a result, L–3 had superior access to information, OSI and L–3 had entered into a confidential relationship in which L–3 undertook a fiduciary duty to OSI. The district court also found, however, that genuine issues of fact existed as to whether L–3 had breached that fiduciary duty and as to the duty's scope and duration.

The case was subsequently transferred to Judge Crotty and proceeded to a jury trial on OSI's fiduciary duty and fraud claims. At trial, the district court charged the jury that because of its superior position in the bidding process, L–3 owed OSI a fiduciary duty, but that the jury needed to determine the scope and duration of that duty and whether L–3 breached it. On the fraud claims, the district court instructed the jury that in the context of a fiduciary relationship, the requirement that the plaintiff prove justifiable reliance was relaxed. The jury found that L–3 had breached its fiduciary duty in failing to convey the conventional and ARGUS lines to OSI. The jury also found for OSI on its actual and constructive fraud claims and found that the amended letter of intent had been fraudulently induced. The jury awarded OSI $33 million in compensatory damages and $92.6 million in punitive damages.

The district court denied L–3's renewed motion for judgment as a matter of law or for a new trial and denied OSI's motion to impose a constructive trust. This appeal followed.

## DISCUSSION

L–3 argues that the district court erred in concluding as a matter of law that L–3 owed OSI a fiduciary duty. We re-

view a district court's legal determinations, whether made on summary judgment or under Rule 50(b), *de novo. See, e.g., ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 145 (2d Cir.2007); *Fabri v. United Techs. Int'l, Inc.,* 387 F.3d 109, 119 (2d Cir.2004). Because, even viewing the facts in the light most favorable to OSI, no reasonable jury could have found that L–3 owed a fiduciary duty to OSI, we conclude that L–3 was entitled to judgment as a matter of law on OSI's breach of fiduciary duty claim.

The parties do not dispute on appeal that California law applies to OSI's fiduciary duty claim.[2] The California Supreme Court has recently made clear that a person can be charged with a fiduciary duty in one of two ways: "[1] he must either knowingly undertake to act on behalf and for the benefit of another, or [2] must enter into a relationship which imposes that undertaking as a matter of law." *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.,* 43 Cal.4th 375, 386, 75 Cal.Rptr.3d 333, 181 P.3d 142 (2008) (quoting *Comm. on Children's Television, Inc. v. Gen. Foods Corp.,* 35 Cal.3d 197, 221, 197 Cal.Rptr. 783, 673 P.2d 660 (1983)). Even viewing the facts in the light most favorable to OSI, we conclude that, in agreeing to submit the bid to PEI on behalf of both companies, L–3 did not undertake a fiduciary obligation either by voluntary agreement or by entering into a relationship imposing a fiduciary duty as a matter of law.

## I. Voluntary Undertaking

◾ OSI argues that L–3 agreed to voluntarily undertake a fiduciary duty when Lanza told Chopra that he would submit

the bid on behalf of both companies. But, as the California Supreme Court stated in *Genentech,* to be charged with a fiduciary duty by voluntary agreement, a person must agree to act primarily for the benefit of another and must undertake that responsibility knowingly. *Id.* There was no explicit recognition in either the original letter of intent or the subsequent oral discussions between Lanza and Chopra that L–3 was agreeing to undertake a fiduciary duty, nor was there any indication that L–3 was entering this arrangement with a view to acting *primarily* for the benefit of OSI—on the contrary, the parties appeared to be contemplating a mutually beneficial transaction. *See id.* ("These contractual provisions indicate that the parties'[ ] common goal was to achieve a mutually beneficial arrangement, not that Genentech had undertaken a fiduciary obligation 'to act on behalf of and for the benefit of another.' "). To the extent that Lanza and Chopra's oral modification of the original letter of intent even constitutes a valid contract, it bears little resemblance to the contracts that typically give rise to fiduciary duties, such as agreements creating voluntary trusts, which explicitly use the words "fiduciary" or "trust." *See* Rafael Chodos, *The Law of Fiduciary Duties* 1–3 (2000). An oral agreement modifying a non-binding letter of intent is not how we expect sophisticated corporations represented by counsel to create such a solemn obligation as a fiduciary duty, especially when there is no evidence of even an oral acknowledgment that L–3 was agreeing to act in a fiduciary capacity towards OSI. Despite Lanza's

---

**2.** Early in the litigation, L–3 contended that New York law should govern in this case. Judge Chin ruled in an unpublished memorandum decision that California law controlled OSI's fiduciary duty claims. L–3 has not appealed that decision. The parties now agree that California law applies to the claims on appeal, and we are aware of no reason to disturb that agreement. *See, e.g., ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.,* 485 F.3d 85, 90–91 n. 4 (2d Cir.2007).

general intention to "protect" OSI in the negotiations with PEI, nothing about the actual negotiations between L–3 and OSI indicated that L–3 intended to undertake a legal obligation to act as a fiduciary. In fact, nearly everything about the parties' conduct in connection with this transaction (*e.g.,* the explicit non-binding nature of the letters of intent, the requirements for board approval before obligations would take effect, the subsequent disclaimers of any binding obligations in the confidentiality agreement) evinced an intent *not* to create binding obligations. Faced with such facts, we cannot say that L–3 knowingly agreed to undertake the obligations of a fiduciary. *See Genentech,* 43 Cal.4th at 386, 75 Cal.Rptr.3d 333, 181 P.3d 142.

## II. Fiduciary Relationships

■ The remaining question, then, is whether L–3 and OSI entered into a relationship that imposes fiduciary duties as a matter of law. The district court found (and the parties do not dispute on appeal) that the relationship between L–3 and OSI did not fall into any of the formally recognized categories of legal relationships carrying fiduciary duties, such as a partnership, a joint venture, or an agency relationship. Instead, the district court found that L–3's agreement to submit the bid on behalf of both companies placed the parties in a "confidential relationship" which gave rise to a fiduciary duty because the agreement put L–3 in a superior position and required OSI to repose trust and confidence in L–3.

A confidential relationship typically arises where one party is particularly vulnerable to another party; this vulnerability usually arises from "advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity." *Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4th 257, 273, 130 Cal.Rptr.2d

601 (Cal.Ct.App.2003). The vulnerability of one party to the other "is the necessary predicate of a confidential relation, and the law treats it as absolutely essential." *Persson v. Smart Inventions, Inc.,* 125 Cal.App.4th 1141, 1161, 23 Cal.Rptr.3d 335 (Cal.Ct.App.2005) (internal quotation marks and brackets omitted). Where one party in a relationship is particularly vulnerable to the other because of such an infirmity, the need to impose a fiduciary duty on the stronger party is obvious. *See, e.g., O'Neil v. Spillane,* 45 Cal.App.3d 147, 151, 153, 119 Cal.Rptr. 245 (Cal.Ct. App.1975) (finding confidential relationship between "aging and lonely woman ... increasingly dependent upon a few friends" and those friends who took advantage of her trust to arrange for her property to be conveyed to them). In some instances, the California courts have expanded the concept and found confidential relationships to exist in commercial dealings. *See, e.g., Stevens v. Marco,* 147 Cal.App.2d 357, 305 P.2d 669 (Cal.Ct.App.1956) (finding that an inexperienced inventor formed a confidential relationship with a businessman to whom he entrusted his secret invention for the purpose of obtaining a patent). *But see Genentech,* 43 Cal.4th at 387–89, 75 Cal.Rptr.3d 333, 181 P.3d 142 (criticizing and limiting *Stevens* ).

OSI was not vulnerable to L–3 in a way that could give rise to an implied confidential relationship. The parties started off on equal footing. Both were sophisticated corporations, experienced in acquisitions, and represented by counsel. OSI was in a position to prevent L–3 from submitting the bid in its name alone. OSI could have insisted that the parties form a joint venture or one of the other formal legal relationships that carry fiduciary duties as a matter of law. Or OSI could have insisted on explicit contract terms providing that L–3 would act in a fiduciary capacity when submitting the bid on behalf of both com-

panies. But OSI did not do any of those things. Instead it allowed L–3 to buy the PEI business in its own name with only the oral assurance of L–3's CEO that it was doing so on behalf of both companies and that they would figure out a way for OSI to acquire the conventional and AR-GUS business lines. L–3 and OSI clearly were not in a confidential relationship before this oral agreement. OSI argues that the oral agreement rendered it vulnerable to L–3 because it lacked control over the negotiations with PEI and access to certain information, and because it placed its trust and confidence in L–3. OSI may have rendered itself vulnerable, but where a sophisticated party that starts on equal footing bargains away its rights without ensuring in the terms of the contract that it is receiving a reciprocal duty, that is not the type of vulnerability that is "so substantial as to give rise to equitable concerns underlying the protection afforded by the law governing fiduciaries." *Genentech,* 43 Cal.4th at 389, 75 Cal.Rptr.3d 333, 181 P.3d 142 (citing *Persson,* 125 Cal. App.4th at 1161, 23 Cal.Rptr.3d 335; *Richelle L.,* 106 Cal.App.4th at 273, 130 Cal. Rptr.2d 601). And the mere fact that OSI reposed trust and confidence in L–3 does not by itself give rise to a fiduciary duty; as the California Supreme Court has noted, "[e]very contract requires one party to repose an element of trust and confidence in the other to perform." *Id.* (quoting *Wolf v. Superior Court,* 107 Cal.App.4th 25, 31, 130 Cal.Rptr.2d 860 (Cal.Ct.App. 2003) (alteration in original)).

We are not persuaded by OSI's reliance on the Ninth Circuit's decision in *In re Daisy Systems Corp.,* 97 F.3d 1171 (9th Cir.1996). In that case, the Ninth Circuit concluded that a fiduciary duty might exist where the CEO of a computer company retained an investment bank to advise it on a potential merger. *Id.* at 1177–79. The existence of a fiduciary duty turned on whether an agency relationship existed between the investment bank and the computer company, and factual issues of whether the bank was acting as an agent precluded summary judgment. *Id.* at 1178. In this case, by contrast, OSI does not contend that L–3 was its agent.

In short, we see no evidence that the conversation between Lanza and Chopra constituted a knowing agreement on L–3's part to voluntarily undertake a fiduciary obligation to act primarily in the interests of OSI. Nor are we persuaded that the a confidential relationship arose between OSI and L–3 based on OSI's vulnerability stemming from the conversation in which OSI, a sophisticated corporation represented by counsel, bargained away its rights to participate in the transaction on equal footing with L–3 without securing any explicit recognition that the parties were entering a fiduciary relationship. We therefore hold, as a matter of law, that L–3 did not owe a fiduciary duty to OSI and we reverse the judgment of the district court as to OSI's breach of fiduciary duty claims.

Because we find that no fiduciary duty existed, we also reverse the district court's judgment on OSI's constructive fraud claim. *See Everest Investors 8 v. Whitehall Real Estate Ltd. P'ship XI,* 100 Cal. App.4th 1102, 1108, 123 Cal.Rptr.2d 297 (Cal.Ct.App.2002) ("[O]nly a fiduciary can be liable for constructive fraud."). With regard to OSI's actual fraud claim, because the district court instructed the jury that OSI's burden of proving justifiable reliance is relaxed in the context of a fiduciary relationship and we have decided that no fiduciary relationship existed, we vacate the district court's judgment as to the actual fraud claim and remand for a new trial on that claim. As we have reversed in part and vacated in part the district court's judgment in favor of OSI, the

cross-appeal for the imposition of a constructive trust is dismissed as moot.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is **REVERSED** in part and **VACATED** in part. The case is **REMANDED** for further proceedings consistent with this order. OSI's cross-appeal is **DISMISSED** as moot.