Filed 9/30/13  DC Media Capital v. Imagine Fulfillment Services CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DC MEDIA CAPITAL, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>IMAGINE FULFILLMENT SERVICES, LLC,<br><br>    Defendant and Appellant. | B239081<br><br>(Los Angeles County<br>Super. Ct. No. BC408418)<br><br>ORDER MODIFYING OPINION<br>(CHANGE IN JUDGMENT) |

THE COURT:

It is ordered that the opinion filed on August 30, 2013 is modified by inserting a new sentence following the first sentence of the Disposition to read: The trial court shall reduce the award of prejudgment interest in this matter to the extent that it is based on an award of damages for defendant's failure to provide respondent with accurate sales revenues.

This modification constitutes a change in the judgment.

_____    _____

     MALLANO, P.J.                            CHANEY, J.

Filed 8/30/13  DC Media Capital v. Imagine Fulfillment Services CA2/1 (unmodfied version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| DC MEDIA CAPITAL, LLC, | B239081 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC408418) |
| v. | |
| IMAGINE FULFILLMENT SERVICES, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Zaven V. Sinanian, Judge.  Affirmed in part; reversed in part.

Dinsmore & Sandelmann, LLP, Frank Sandelmann and Scott D. Dinsmore for Defendant and Appellant.

Law Offices of Jon A. Kodani, John A. Kodani and Jeffrey J. Williams for Plaintiff and Respondent.

_____

Following a bench trial, defendant Imagine Fulfillment Services, LLC (IFS) was found liable to plaintiff DC Media Capital, LLC (DC Media) for breach of a contract to provide inventory, billing, shipping and related services to a third party, Shopflash, Inc., the manufacturer of vacuum cleaners. On appeal, IFS argues: (1) it had no contract with DC Media; (2) even if IFS had a contract, it didn't breach the contract; and (3) even if it breached the contract, DC Media suffered no damage. IFS further maintains that the trial court failed to provide an adequate statement of decision on material controverted issues.[1] We reverse as to damages for failure to provide accurate sales revenues. In all other respects, we affirm.

## FACTS AND PROCEEDINGS BELOW

This lawsuit stems from a sales campaign by Shopflash to market its vacuum cleaners through the Internet and "infomercials."

Shopflash and DC Media entered into a contract in which DC Media provided the financing for Shopflash to buy media time for its advertising. Shopflash also entered into a contract with IFS to receive the vacuums into stock, ship them to customers, process credit cards, provide customer service and deal with returns. IFS refers to itself as a part of the "direct response industry." Shopflash fell behind in its payments to IFS and IFS suspended its services to Shopflash. When DC Media learned of Shopflash's failure to make payments to IFS it "took over" the sales campaign and began dealing directly with IFS. By mid-June 2006, DC Media paid IFS all that it was owed by Shopflash.

In June 2006, Andy Arvidson, a principal of IFS, sent an email to Robert Hanington, a principal of DC Media which stated in relevant part: "Hi, Bob! Here is your agreement as promised!" Arvidson attached to the email a five-page document entitled "Fulfillment Service Contract." No one representing IFS or DC Media ever signed the document. Nevertheless, between June 2006 and January 2007 IFS billed DC

---

[1]     In its opening brief IFS states that it also appeals the order denying its new trial motion. Its brief contains no argument on this issue so the issue is abandoned. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074.)

Media just over $1 million for its services to Shopflash, and DC Media paid those invoices.  IFS sent financial reports to DC Media and consulted it on operational issues such as whether to switch shipping companies for the vacuums.

In February 2009, DC Media brought this action against IFS for breach of contract and negligence.  DC Media contends that the document IFS sent it in June 2006 constituted a contract between it and IFS and that IFS breached this contract and acted negligently by overcharging DC Media for shipping vacuums, failing to credit DC Media for shipping charges it paid in advance, overstating sales revenue, and providing unsatisfactory customer service.

IFS responded that it had no contract with DC Media and denied that it overcharged or failed to credit DC Media for shipping and denied that it overstated sales revenue or furnished unsatisfactory customer service.

Following a bench trial, the court entered judgment in favor of DC Media and thereafter denied IFS's motion for a new trial.  IFS filed a timely notice of appeal.

## DISCUSSION

### I.      CONTRACT FORMATION

IFS contends that it cannot be held liable to DC Media for breach of contract because the parties did not have a contract.  The trial court found otherwise and we agree.

#### A.      Standards of Review

The trial court found that the document IFS submitted to DC Media constituted an offer by IFS to provide specified services to Shopflash in return for DC Media's payment of the fees and costs for those services and that DC Media accepted the offer by paying IFS those fees and charges.  On appeal, IFS argues that the document was a draft proposal for a contract, too vague to constitute an actual offer, but even if it was an offer, as a matter of law it could only be accepted by an authorized signature on behalf of DC Media which was never provided.

Whether the document was sufficiently certain to constitute an offer to make a contract was a question of fact for the trial court.  (See discussion at p. 6, *post*.)

3

Whether the offer could be accepted by performance was a mixed question of law and fact. (See discussion at pp. 6-9, *post*.) We review questions of law independently and we review questions of fact for sufficient evidence.

In reviewing the sufficiency of the evidence our task begins and ends with a determination whether any substantial evidence exists, contradicted or uncontradicted, that supports the trial court's conclusions. (*Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1229.) Here there was conflicting evidence on the question whether DC Media's performance after receiving IFS's contract offer constituted acceptance. A reviewing court will not find the trial court's factual conclusions unsupported "merely because it might reasonably draw different inferences from those the trial court reasonably drew." (*Ibid.*) An appellate court will only interfere if "it clearly appears that under no hypothesis is there substantial evidence to support the [court's] finding." (*Ibid.*)

### B.    The Document Was An Agreement, Not Merely A Draft

IFS contends that the document Arvidson emailed to Hanington was merely a draft proposal for a contract as evidenced by its failure to name DC Media as the offeree. This contention lacks merit.

The offer that Arvidson emailed to Hanington referred to IFS as the "vendor" but did not refer by name to DC Media. Instead, it referred to the "buyer" or "client" as "Bob Hannington's [*sic*] Company Name." IFS contends that the failure to name DC Media as offeree rendered the offer too vague to be accepted and shows that it was only a draft of an offer. We disagree.

Arvidson testified that he intended to enter a contract with Hanington to ensure that IFS would be paid for its services to Shopflash and that he referred to Hanington's "company" instead of DC Media because: "I didn't know Bob's exact company name at that point in time." It is undisputed that at all times relevant to this case Hanington was a principal in DC Media and therefore DC Media could reasonably be referred to as "Bob Hanington's company." Furthermore, IFS concedes that DC Media had been paying

4

invoices on behalf of Shopflash prior to Arvidson sending the agreement to Hanington so it is reasonable to conclude that the "company" referred to in the agreement is DC Media.

### C. Acceptance By Performance As A Matter Of Law

IFS argues that the document it submitted to DC Media was an offer for a bilateral contract which as a matter of law could not be accepted by performance but only by a return promise—which DC Media never gave. IFS cites no authority for the purported rule that an offer for a bilateral contract can only be accepted by a promise to perform, never by performance itself. We decline to adopt such a rule.

We find it unnecessary to decide whether IFS's offer was for a bilateral or unilateral contract because, while recognizing the formal distinction between the two (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 10, fn. 4), California has never adopted a rule that an offer of a bilateral contract cannot be accepted by performance. Section 1584 of the Civil Code, without mentioning the nature of the offer, states: "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."

The Restatement Second of Contracts, section 32, states that when an offer is ambiguous as to the required mode of acceptance, either a promise or performance will do. "In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses." (Rest.2d Contracts, § 32.) Allowing the offeree to accept either by promise or performance makes sense because the offeree could suffer a considerable loss if it chooses to accept the offer by performance but the offeror is allowed to deny the existence of a contract on the ground the offeree should have chosen to accept by a promise. On the other hand, if the offeror expected a promise but received performance instead, it should not be heard to complain because it got the performance it sought through the contract. (*Klein v. Farmer* (1948) 85 Cal.App.2d 545, 555; and see Eisenberg, *Expression Rules in Contract Law and Problems of Offer and Acceptance* (1994) 82 Cal. L.Rev. 1127, 1177.)

5

We conclude therefore that DC Media was not barred as a matter of law from accepting the IFS offer through performance.

### D.     Acceptance By Performance As A Matter Of Fact

The trial court found as a matter of fact that DC Media accepted the IFS offer by performance.

Andy Arvidson, a principal of IFS, testified that in June 2006 he sent an email to Robert Hanington, a principal of DC Media "in an effort to clarify the future rights and obligations of the parties with respect to the Shopflash campaign." That email stated in relevant part: "Hi, Bob! Here is your agreement as promised!" The email did not say "Here is a draft agreement" or "Here is a proposal for an agreement." A five-page document entitled "Fulfillment Service Contract" was attached to the email. The parties agree that no one from IFS or DC Media ever signed the document. It is also undisputed, however, that no one at IFS ever asked anyone at DC Media to sign the document and that the document does not explicitly preclude acceptance by performance.

Beginning in August 2006, IFS sent 25 invoices to DC Media for services performed for Shopflash totaling over $1 million. DC Media paid all of these invoices. In February 2007 IFS and DC Media had disputes over shipping policies and costs. Arvidson sent Hanington an email that advised him that IFS "wants to resolve this situation as quickly as possible in a manner that is consistent with our agreement" and referred to IFS's "obligation under our agreement with your company."

IFS admitted that the agreement does not expressly state that it must be signed by the parties in order to take effect but pointed out that it contains several indications that the signatures of the parties were necessary. For example, the last page of the agreement contains lines for signatures on behalf of IFS and DC Media. Above those signature lines the agreement states: "By signing in the spaces provided below, Vendor [IFS] and Buyer [DC Media] accept and agree to all of the terms and conditions of this Contract." Furthermore, in the lower right corner of each page of the agreement are lines for initials by persons representing IFS and DC Media. Paragraph 4(b) states "this

6

Contract has been duly executed and delivered by [IFS]." The agreement also provides that it "will remain in place until a new contract is signed or until either party terminates this agreement [by] 30 days written notice."

IFS also argues that DC Media did not accept the offer because after the offer was submitted it continued to negotiate with IFS over the amount of customer service charges. The interpretation of an acceptance is a question of fact for the trial court. (*Guzman v. Visalia Community Bank* (1999) 71 Cal.App.4th 1370, 1376.) Here the trial court could reasonably have concluded that DC Media's performance of the agreement while still negotiating the amount of customer service charges constituted a "grumbling" "acceptance" of the IFS offer. (*Ibid.*) At the very least, the parties' June 29, 2006 agreement on the service charges establishes that date as the effective date of their contract rather than June 6, 2006, the date the agreement was emailed to DC Media.

Where, as here, the statement of decision sets forth the factual basis for the decision "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.) We are satisfied that substantial evidence supports the trial court's finding that DC Media accepted IFS's offer through performance at least as of the date the first invoice was paid.[2]

---

[2] IFS argues that the evidence does not support the trial court's finding that the June 6, 2006 email from Arvidson to Hanington "stated that the contract [attached to the email] was binding on IFS and that it superseded the earlier April 2006 contract between Shopflash and IFS." The agreement, not the email, states that it is binding on IFS. IFS is correct that neither the email nor the agreement states that the agreement supersedes the earlier contract between Shopflash and IFS but, even if incorrect, that error does not effect the validity of the court's finding that a contract existed between IFS and DC Media.

7

## II. BREACH OF THE CONTRACT

### A. The Overcharge For Shipping

#### 1. Factual background

Paragraph 12 of the parties' agreement states in relevant part: "This Contract may be changed, modified or amended only if agreed to in writing." In a later unnumbered paragraph the agreement states that any changes to the agreement "will become amendments to this Contract and will become binding only when executed by authorized representatives of both parties."

On October 6, 2006, Caroline Lacsamana, the sales and marketing manager at IFS, sent Hanington an email informing him that the Post Office had raised its shipping rate for the vacuums to $26.44 per box compared to the Federal Express rate of $19.16. She asked Hanington to "let me know if you would like to change the method of shipping." The next day Hanington answered in an email: "If only for the returns—I want to make the switch to Fed Ex." On October 9, 2006, Lacsamana replied in an email: "You got it. We will ship Fed-Ex ground." She then emailed others at IFS stating that: "We will now be shipping via Fed-Ex [g]round."

#### 2. Substantial evidence supports the court's finding that the modification was effective

The court found that the exchange of emails between Lacsamana and Hanington constituted a written modification of the parties' contract and that between October 13 and December 8, 2006, IFS breached the modified agreement by charging DC Media for shipping costs at the higher post office rate rather than at the lower Federal Express rate resulting in an overcharge to DC Media of $127,160.

IFS does not contest the court's finding that the emails between Lacsamana and Hanington constituted a written modification of the agreement. It argues instead that the modification never took effect because it was never "executed [i.e. signed] by authorized representatives of both parties" as the agreement required. We disagree.

If, after the exchange of emails between Lacsamana and Hanington, IFS had continued to ship the vacuums via the postal service instead of Federal Express, it could

8

argue with some weight that the purported modification never took effect because the parties never executed it. But the evidence is undisputed that after Lacsamana emailed Hanington stating: "You got it. We will ship Fed-Ex ground." IFS did indeed ship by Federal Express. Having switched from the postal service to Federal Express, as called for by the modification, IFS is estopped from arguing now that the modification never took effect.

### B. Damages For Failure To Provide Correct Revenue Reports.

IFS claims that the evidence does not support the trial court's finding that it breached the agreement by including declined credit card transactions in its revenue reports to DC Media and that the evidence does not establish the amount of damages suffered by DC Media, if any. There is no need to address the issue of breach because even if the inclusion of the declined credit cards breached the agreement, DC Media failed to prove damages.

### 1. Factual background

IFS provided Shopflash and DC Media with a customer relationship management system called Orderwave. When a customer ordered a vacuum cleaner, Orderwave would charge the customer's credit card, house the customer's billing and shipping information, record the unit price, the shipping method and the price for shipping.

Orderwave also produced periodic reports of vacuum sales revenue. IFS sent these reports to DC Media and DC Media relied on them in deciding how much future media time to purchase for the Shopflash campaign.

Not all orders for vacuums resulted in actual sales revenue for Shopflash. Some orders were declined, meaning that a purchaser's credit card could not be charged, usually due to a lack of available credit. On those declined orders, IFS would typically try to charge the purchaser's credit card three or four times before discontinuing its efforts. Orderwave continued to treat the sale as revenue, however, until it was pronounced "dead."

9

In December 2006, IFS disclosed to DC Media for the first time that its Orderwave system had overstated revenue by $428,000—roughly 20-25 percent of total sales. This occurred because Orderwave included orders in which the customer's credit card had been declined during the prior three and one half months, dating back to September 2006.

The court found that before IFS made this disclosure, the information in Orderwave led DC Media to reasonably believe that actual sales revenue included $428,000 in orders that in reality had been declined. By then DC Media had invested more than $1.5 million in the project. The court further found that DC Media would not have invested $1.5 million but for the revenue reported by Orderwave.

Based on this evidence, the court concluded: "By failing to disclose the existence of $428,000 in orders that had been declined, and reflecting those orders as actual sales revenue, IFS did not provide DC Media with crucial information and failed to provide . . . service [per the agreement]." The court found that DC Media had been damaged in the amount of $1,552,713 representing the amount of its media buys between September 11, 2006 and November 27, 2006.

###        2.        The damage award of $1,552,713 is not supported by any evidence

The court found that IFS's overstatement of revenue "resulted in DC Media losing more than $1.5 million that DC Media would not have invested if IFS had provided accurate information."

Although the record supports the court's finding that DC Media justifiably relied on the sales information provided by IFS in deciding how much to spend on advertising, the record does not support the court's finding that DC Media suffered a loss equal to the total amount it spent in advertising during the relevant period. DC Media did not produce any evidence as to the actual amount of its loss. The mere statement that it would not have invested $1,552,713 does not mean that it lost the entire amount.

Thus, DC Media did not offer proof of the amount it lost on account of the shortfall in sales it reasonably expected based on the prior sales data provided by IFS.

The only theory on which DC could have suffered a loss of the entire amount it spent in reliance on incorrect sales information is if the expenditure produced no revenue at all. But the record indicates that DC received revenue during the relevant period, and DC never offered any evidence to rebut this fact.

As IFS pointed out in its brief, "Respondent did not prove its damages, but instead simply introduced evidence of the amount of money it spent on advertising, which is not a measure of damages, it is simply one element of a lost profit or reliance calculation."

DC's citation of section 349 of the Restatement Second of Contracts is misplaced. This section does not authorize recovery of damages where none has been proved. It merely provides that DC Media had a right to damages for expenditures made in reliance on the incorrect information. DC Media still had an obligation to prove the actual amount of its expenditures in reliance on the incorrect information, and it failed to do so. "It is well settled that the party claiming the damage must prove that he has suffered damage and prove the elements thereof with reasonable certainty." (*Mendoyomo, Inc. v. County of Mendocino* (1970) 8 Cal.App.3d 873, 880-881.) "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin." (Civ. Code, § 3301.) "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." (Civ. Code, § 3300.)

DC Media does not respond directly to IFS's arguments regarding damages. It merely cites contract provisions which provide no guidance, i.e., "the agreement provides no limit on the kind of damages that can be recovered;" the agreement states that IFS "shall indemnify [DC Media] for any and all losses;" and general legal principles which shed no light on the issue, i.e., "rules governing contract damages are flexible;" where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. None of these arguments addresses the fact that DC Media never even attempted to establish the actual amount of its loss.

11

### C. Prepaid Shipping Charges

DC Media claimed that IFS breached the agreement by failing to credit $256,673 in advance shipping charges it paid to IFS.

#### 1. Factual background

The agreement provided that DC Media would make advance payments of shipping costs to IFS on demand. Although the agreement did not specifically state that IFS had to reconcile these payments (i.e. provide an accounting to DC Media showing how these advance payments were spent or credited) it was IFS's practice to do so. But when DC Media asked IFS for reconciliations of four advance payments it made between June 2006 and January 2007, IFS was unable to show how these payments were spent or credited. At trial, DC Media introduced evidence showing the amount of each shipping advance it paid to IFS and IFS's accounting, if any, of those payments.

The court found that during the period in question DC Media paid IFS $650,238 in advance shipping charges but IFS charged only $393,565 of that amount to shipping. Therefore, the court found, IFS breached the agreement by not giving DC Media credit for $256, 673 in advance shipping charges.

#### 2. Substantial evidence supports the court's finding that IFS failed to credit DC Media with the total amount of its advance shipping payments

On appeal, IFS argues that the court erred in imposing a duty on it to provide accountings of shipping costs when no such duty was contained in the agreement and in placing on it the burden to prove that it had applied the advance shipping payments to shipping. We reject both contentions.

The court did not find that IFS breached the agreement by failing to submit accountings of the advance shipping payments to DC Media. Rather, the court found that IFS breached the agreement by failing to credit DC Media with over a quarter million dollars in advance shipping payments. An accounting of the advance payments would have been one way for IFS to show that it had credited DC Media with the payments.

12

IFS contends that the court erred in requiring it to prove that it had credited the payments because under Evidence Code section 500 the burden of proof was on DC Media to prove that it hadn't.

Evidence Code section 500 provides that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." But this rule applies only "[e]xcept as otherwise provided by law." (*Ibid.*) Where the evidence necessary to establish a fact essential to the plaintiff's claim lies exclusively within the knowledge of the defendant, the defendant has the burden of going forward with the evidence on the issue even though it is not the party asserting the claim. (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 35.)

Arvidson testified that if there was evidence of how IFS applied the advance shipping payments "it probably resides on our accounting server." It is fair to presume information that "resides on [IFS's] accounting server" is in the exclusive control of IFS. Here, DC Media met its burden of proof of breach of contract with evidence showing that it paid $650,238 in advance shipping costs and received credit for only $393,565, leaving $256,673 unaccounted for. If IFS had evidence in its computer system showing that it credited DC Media with shipping costs beyond those reflected in its accountings then fundamental fairness required IFS to go forward with that evidence. In this sense, this case is no different from a lawsuit to recover money owed under a promissory note in which the burden is on the defendant to prove that its payment obligation has been satisfied. (See *Wolf v. Superior Court*, *supra*, 107 Cal.App.4th at p. 36 citing *Pacific States Sav. & L. Co. v. Painter* (1940) 37 Cal.App.2d 645, 646-647.)

### D.    DC Media's failure to pay invoices immediately on receipt

IFS asserts that DC Media's failure to pay its invoices on time breached the agreement and relieved it of any duties under the agreement. We disagree.

The agreement states that "invoices [are] due upon receipt." In addition, Civil Code section 1657 provides that if an act "is in its nature capable of being done

13

instantly—as, for example, if it consists in the payment of money only—it must be performed immediately upon the thing to be done being exactly ascertained." IFS maintains that DC Media's failure to pay its invoices immediately upon receipt bars DC Media from pursuing a claim for breach of contract against IFS. We disagree. Williston on Contracts observes that modern courts and the Restatement Second of Contracts recognize that if a prior breach was "slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach." (14 Williston on Contracts (4th ed. 2013) § 43.5.)

DC Media produced undisputed evidence that between August and December 2006 it generally paid IFS's invoices within four to five business days from the date they were received. There is no evidence that IFS ever complained to DC Media about the lateness of its payments or that IFS ever exercised its right under the agreement to suspend service or charge interest. IFS's restraint is evidence that it considered a four or five day delay in the payment of its invoices "slight or minor, as opposed to material or substantial." Therefore, these short delays did not relieve IFS of its duty to perform its obligation under the agreement.

Furthermore, an injured party, with knowledge of the other party's breach, who continues to accept performance from the breaching party may be found to have waived the breach. (*Whitney Inv. Co. v. Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 603.) Here, the evidence disclosed a minor breach by DC Media but it also disclosed that IFS accepted the "late" payments for five months without complaint or exercising its contractual remedies to suspend service or charge interest on the late payments. The court could reasonably conclude from this evidence that IFS waived the minor breach.

### E. Adequacy of the Court's Statement of Decision

Finally, IFS maintains the judgment must be reversed because the court failed to make findings as to certain material controverted issues and other findings were not supported by substantial evidence.

14

It would unduly prolong this already lengthy opinion to set forth in detail the six allegedly material controverted issues on which IFS claims the court failed to make findings and the eight allegedly controverted issues which it claims are not supported by substantial evidence. In our discussion above we have addressed the major controverted issues as identified by IFS's appellate brief and identified the trial court's legal reasoning and the evidence that supports or does not support its conclusions as to each of those issues.

## DISPOSITION

The judgment is reversed insofar as it awards any damages to plaintiff for defendant's failure to provide accurate sales revenues. In all other respects the judgment is affirmed. Each party to bear its own costs on appeal.

NOT TO BE PUBLISHED.


ROTHSCHILD, J.

We concur:


MALLANO, P. J.                    CHANEY, J.


15