Filed 6/25/25  Dorian v. San Jose Towers CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL DORIAN, et al.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAN JOSE TOWERS, LLC, et al.,<br><br>    Defendants and Appellants. | H050432<br>(Santa Clara County<br>Super. Ct. No. 18CV325729)<br><br>**ORDER DENYING REHEARING AND MODIFYING OPINION**<br><br>**NO CHANGE IN JUDGMENT** |

BY THE COURT:

It is ordered that the opinion filed herein on May 30, 2025, be modified as follows:

On page 26, the third full paragraph beginning with "The matter is remanded" is deleted and the following paragraph is inserted in its place:

"The matter is remanded to the trial court with directions (1) to enter judgment in favor of San Jose Towers, LLC, Gregory Bock, the Bock Family Trust, Arnold Kamrin, and the Kamrin Family Trust on Michael Dorian's breach of contract cause of action; (2) to enter judgment in favor of Gregory Bock, the Bock Family Trust, Arnold Kamrin, and the Kamrin Family Trust on Michael Dorian's breach of fiduciary duty cause of action; (3) to vacate the damages awarded to Michael Dorian against San Jose Towers, LLC on his breach of fiduciary duty cause of action; (4) to vacate the judgment in favor of Michael Dorian on cross-claimant San Jose Tower, LLC's breach of contract cause of

action; and (5) to hold further proceedings consistent with this opinion on Dorian's breach of fiduciary duty cause of action and on cross-claimant San Jose Tower, LLC's breach of contract cross-claim."

There is no change in the judgment.

The petition for rehearing is denied.

_____

BROMBERG, J.


_____

GROVER, ACTING P. J.


_____

LIE, J.


*Dorian et al. v. San Jose Towers, LLC, et al.*
H050432

Filed 5/30/25  Dorian v. San Jose Towers CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MICHAEL DORIAN et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>SAN JOSE TOWERS, LLC, et al.,<br><br>    Defendants and Appellants. | H050432<br>(Santa Clara County<br> Super. Ct. No. 18CV325729) |

Briand Properties, LLC (Briand), a real estate development company formed by plaintiff Michael Dorian, owned two lots in San José.  After Briand declared bankruptcy, Dorian and the bankruptcy trustee entered into a series of agreements with defendants San Jose Towers, LLC (SJT), Gregory Bock, and Arnold Kamrin (collectively, Defendants) who controlled several properties adjacent to Briand's lots.  Pursuant to these agreements, Defendants paid several million dollars to the bankruptcy trustee, which were used to satisfy Briand's debts.  Briand's lots were then transferred to SJT, which (after some delay) transferred the lots to a new limited liability corporation, and that limited liability corporation combined the lots with SJT's properties and sold them all.

Under one agreement between Dorian and SJT, Dorian was supposed to contribute excess funds from the bankruptcy to the new limited liability corporation.  Under other

agreements, SJT was supposed to share the profits from the sale of the Briand lots with Dorian. However, Dorian did not contribute the excess funds, and SJT did not distribute any profits to Dorian.

Accordingly, Dorian sued Defendants for, among other things, breach of contract and breach of fiduciary duties, and Defendants cross-claimed for, among other things, breach of contract. The trial court found in Dorian's favor on his contract and fiduciary duty claims, and it rejected Defendants' contract cross-claim on the ground that the agreement underlying that claim was unenforceable. Ultimately, the trial court awarded Dorian over $2 million dollars in damages and more than $500,000 in attorney's fees.

Defendants now appeal the awards on Dorian's contract and fiduciary duty claims as well as the denial of SJT's contract cross-claim. As explained below, we determine that Dorian's contract claim should be denied because it is based on an agreement that Dorian had no right to enforce. In light of this determination, we also conclude that the damages awarded Dorian on his fiduciary duty claim should be recalculated and that SJT's contract cross-claim should be reinstated. Accordingly, we reverse the judgment and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The Briand Lots and Bankruptcy

In 2006, Michael Dorian formed Briand, which bought two lots in San José (the Briand Lots or Lots.) Briand failed to develop the Lots successfully, and in January 2016, it filed for bankruptcy, which in July 2016 was converted into a Chapter 7 liquidation. A bankruptcy trustee (Kari Bowyer) was appointed, and in November 2016 she sold the Briand Lots to SJT, a limited liability corporation with three members—the family trusts of Kamrin, Bock, and Robert Johnston—which owned lots next to the Briand Lots. SJT paid $3.64 million for the Briand Lots. Most of this amount was used to satisfy Briand's debts, but approximately $800,000 was distributed to Dorian.

2

### B. The Agreements Concerning the Briand Lots

There were four agreements concerning the Briand Lots. The agreements had different though overlapping parties, and, even more importantly, different terms.

#### 1. *The Preliminary Agreement*

The first agreement was in May 2016, and it was between Briand (with Dorian signing on its behalf), Kamrin and Johnson (the Preliminary Agreement). The Preliminary Agreement, which was handwritten, stated that an investor group including Johnston, Bock, and another person to be named later, would pay $3.6 million for the Briand Lots as well as a consultant fee of $10,0000 per month. A new limited liability corporation would be formed to hold title to the Lots. Membership in the limited liability corporation would be divided equally between Briand and the investor group, but profits would be split "45% Briand and 55% investor group." The Preliminary Agreement also provided that, in case of any disagreement concerning the limited liability corporation, "the decisions shall be made by Arnold Kamrin," and his decisions "shall be final." Finally, the Preliminary Agreement stated that it was "to be used as the basis for a final version of this contract."

#### 2. *The Purchase Offer*

On August 2, 2016, about a month after Briand's bankruptcy was converted into a liquidation and a bankruptcy trustee was appointed, SJT made an offer for the Briand Lots, which was signed by the trustee, SJT, Kamrin, Bock, and Johnston.

As in the Preliminary Agreement, the proposed purchase price was $3.6 million, but there was no monthly consultant fee. Like the Preliminary Agreement, the Purchase Offer also provided that "a new LLC shall be formed," the new limited liability corporation would be owned 50 percent by Briand and 50 percent by SJT, but profits would be divided 45 percent for Briand and 55 percent for SJT. In addition, the Purchase Offer added a provision concerning calculation of profits. This provision stated that net profits would be determined by subtracting all costs attributable to the Briand Lots,

"including the $3,600,000 purchase price," from the proportionate sale price of the Lots, which would be calculated using the relative percentage of square footage in the Lots compared to that of the entire project.

The Purchase Offer gave Dorian no control over the new limited liability corporation. Like the Preliminary Agreement, the Purchase Offer provided that, in the event of any disagreement concerning the corporation, Kamrin would have exclusive authority. In addition, the Offer provided that Briand's interest would be held in trust and an independent third party would be selected by Kamrin to represent the interests of Briand and Dorian. Finally, the Purchase Offer provided that Briand would forfeit any right to profit sharing if Dorian hindered, obstructed, or delayed the contemplated development project.

Although neither Dorian nor Briand signed the Purchase Offer, Dorian submitted a declaration to the Bankruptcy Court stating that he had reviewed the offer, he approved it, and he wanted the court to approve it as well.

### 3. *The Purchase Agreement*

On August 12, 2016, the bankruptcy trustee and Bock on behalf of SJT signed the Real Property Purchase Agreement (Purchase Agreement or Agreement). The Agreement stated that it was between "San Jose Towers, LLC ('Buyer')" and "Kari Bowyer, solely in her capacity as Chapter 7 Trustee ('Seller')." It also said that "[t]he Seller and the Buyer are each a 'Party' and collectively the 'Parties.'"

Like the Preliminary Agreement and the Purchase Offer, the Purchase Agreement required SJT to pay $3.6 million for the Briand Lots. In addition, the Agreement provided that Dorian would receive a portion of the purchase payment ($345,000), that the rest of the payment would be used to pay Briand's debts, and that any remaining, excess funds would be distributed to a new limited liability corporation. However, a subsequent addendum provided that the excess funds would be paid to Dorian "who,

4

subject to the terms of the new LLC, may be obligated to deliver the excess funds to the New LLC."

Like the Preliminary Agreement and the Purchase Offer, the Purchase Agreement also specified the ownership and division of profits in the new limited liability corporation. However, it provided that Dorian rather than Briand would have a 50 percent ownership interest in the corporation and receive 45 percent of the net profits. The Purchase Agreement did not say anything about how the corporation would operate or disagreements would be resolved, but it contained an "assert[ion]" from SJT that it would enter into an agreement with Dorian to transfer title to the Briand Lots to the new limited liability corporation "immediately after acquir[ing] ownership" of the Lots. In addition, the Agreement made it an "express condition" of the trustee's duty to execute the Agreement and seek court approval that Dorian "unconditionally approve all terms and provisions of this Agreement."

The Purchase Agreement also contained an integration clause, stating that the Agreement "constitutes the entire agreement between the Parties with regard to the [Briand Lots]" and may only be amended or modified in writing. In addition, the Agreement expressly prohibited third-party beneficiary claims: "The Parties intend that no third-party beneficiary shall have any rights or claims by reason of this Agreement."

Unlike the Purchase Offer, the Purchase Agreement was signed by Dorian. Below the signatures of the trustee and SJT, the Agreement contained a signature block in which Dorian "represent[ed] and warrant[ed] to the Parties" that he had carefully reviewed the Agreement, understood its terms and provisions, and unconditionally approved those terms and provisions. SJT's counsel also signed the Agreement, approving it "as to Form and Content."

### 4. The November Agreement

In October 2016, the Bankruptcy Court approved the Purchase Agreement. Later that month, 545 South Second Street, LLC (Second Street LLC), the new limited liability

5

corporation contemplated by the Purchase Agreement, was organized. The following month, noting that additional agreements needed to be memorialized to finalize the Purchase Agreement among the parties, SJT and Dorian signed a one-page agreement (the November Agreement).

The November Agreement had three provisions. First, the Agreement stated that the "May 19, 2016 handwritten agreement"—the Preliminary Agreement—"is incorporated by reference herein," but that Dorian would be inserted in the place of Briand wherever Briand appeared in the Preliminary Agreement. Second, the Agreement stated that the Purchase Offer "shall be incorporated by reference" to the extent that it contained terms not in the Purchase Agreement, and that Dorian would be inserted in the place of Briand in the Purchase Offer. Third, the Agreement provides that Dorian "shall immediately turn over" to Second Street LLC all excess funds from the bankruptcy.

## C. The Second Street LLC Operating Agreement

In addition to the Preliminary Agreement, the Purchase Offer, the Purchase Agreement, and the November Agreement, there is one additional agreement relevant to this appeal: the Second Street LLC operating agreement. This agreement provided that Second Street LLC would have two members: SJT and Al Haimson, as trustee for Dorian. Like prior agreements, the South Street LLC operating agreement provided that SJT and Dorian, albeit via Haimson, each had a 50 percent membership interest, but that net profits from the Briand Lots would be divided 45 percent to Dorian and 55 percent to SJT. In addition, like the Purchase Offer, the operating agreement provided that the purchase price for the Briand Lots would be treated as costs attributable to the Lots and that revenue from the Lots would be calculated as a percentage of the square footage of the entire project sold by Second Street LLC. Finally, similar to the Preliminary Offer and the Purchase Offer, the operating agreement provided that, if there were a deadlock in voting, Kamrin would have the deciding vote.

6

The Second Street LLC operating agreement also stated that "[e]ach member shall make an Initial Contribution to the Company." SJT's initial contribution was the $3.64 million purchase price for the Briand Lots, less excess funds from the bankruptcy received by Second Street LLC. Dorian's initial contribution was the excess funds.

SJT signed the operating agreement in October 2018. However, Haimson did not sign the agreement until December 20, 2016. And Dorian never signed the operating agreement or contributed excess funds from the Briand bankruptcy.

## D. The Urban Community Purchase

Although the bankruptcy trustee transferred the Briand Lots to SJT in November 2016, SJT did not transfer the Lots to Second Street LLC until November 2018, two years later, after Dorian had filed a lis pendens.

In July 2019, Second Street agreed to sell the Briand Lots to Urban Community Fund, LLC (Urban Community) as part of a project involving several adjacent properties. The purchase price was $22.5 million. The sale closed in March 2020. At that point, Urban Community paid $13.7 million in cash, much of which was used to pay off debts, including $4.4 million to the Arnie Kamrin Living Trust and $695,467 to the Bock Family Trust. The remainder of the purchase price was received in the form of a promissory note with a one-year period and two extensions.

Claiming that it had no net profits, Second Street LLC did not distribute any of the funds it received to Dorian.

## E. Proceedings Below

In March 2018, Dorian sued SJT, Kamrin, Bock, Johnston, and Haimson, asserting breach of contract, breach of fiduciary duty, and eleven other claims. Because Dorian alleged that he signed the November Agreement under duress, his breach of contract claim was based on the Purchase Agreement. Although Dorian was not a party to the Purchase Agreement, he alleged that he was "a signatory and an intended beneficiary of the Agreement." Dorian subsequently amended his complaint to add Second Street LLC.

7

In turn, SJT and Second Street LLC filed cross-claims against Dorian and Briand, alleging breach of the November Agreement and seven other claims.

At the parties' request, a referee was appointed "to make determinations concerning the entire Action" pursuant to Code of Civil Procedure section 638, subdivision (a). (The referee is subsequently referenced as the trial court.) The trial court conducted a trial in three phases, issuing three statements of decision and a decision concerning attorney's fees.

### 1. *Phase One*

In the first phase of the trial, the trial court considered the validity and enforceability of the relevant contracts. The court held that Dorian had standing to enforce the Purchase Agreement. It reasoned that Dorian was more than just a third-party beneficiary because he signed and approved the Purchase Agreement, and because he received benefits from and incurred legally binding obligations under the Agreement. In addition, although the court rejected Dorian's contentions that he was coerced into signing the Agreement and that he lacked capacity to enter into it, it held the November Agreement unenforceable on the ground that it improperly modified the Purchase Agreement, violated the Purchase Agreement's superseding clause, and lacked consideration. Finally, the trial court included a "comment" that the November Agreement's provisions are "unconscionable" and would not be enforced even if the November Agreement were otherwise enforceable.

### 2. *Phase Two*

In the second phase of the trial, the trial court focused on liability issues, but not causation or damages. The court found that SJT breached the Purchase Agreement in three ways: (1) not immediately entering into a binding agreement with Dorian concerning a new limited liability corporation, (2) not transferring title to the Briand Lots for two years, and (3) not distributing to Dorian profits from the sale of the Lots to Urban Community. The trial court also found that SJT, Kamrin, Bock and Johnston owed

8

Dorian fiduciary duties, which they breached by, among other things, not distributing sale profits. Finally, the court found that Haimson owed Dorian a fiduciary duty, which he breached by doing nothing to assist, inform, or aid Dorian. However, the trial court denied Dorian's concealment and intentional interference claims as well as SJT's cross-claims for breach of contract and Defendants' fraud cross-claim.

### 3. Phase Three

In the trial's final phase, the court considered causation and damages. It found that Dorian was entitled to recover $2,165,808 for breach of contract. The trial court reached this figure by finding that Dorian's share of the revenue from the $22.5 million sale to Urban Community was approximately $3.2 million, and the costs attributable to the Briand Lots were $215,591, but that $811,000 in excess funds from the bankruptcy not turned over by Dorian should be offset against the net profits owed Dorian. The trial court also found SJT, Bock, Kamrin, and Johnston liable for the same amount for breaching their fiduciary duties to Dorian. However, the court found that Dorian failed to prove any damages from Haimson's breaches.

### 4. Attorney's Fees

Because the Purchase Agreement provides for recovery of attorney's fees, the trial court awarded Dorian $511,707.50 in fees as well as over $50,000 in costs.

### 5. Judgment

On May 7, 2022, the trial court entered judgment in favor Dorian and against SJT, Bock, Kamrin, Johnston, and their family trusts for $2,165,808 in damages, $511,707.50 in attorney's fees, and over $50,000 in costs.[1] Defendants filed a motion for new trial or revised judgment, which was denied on September 6, 2022.

---

[1] Dorian's thirteenth cause of action was for dissolution of 545 Second Street, LLC. The judgment stated that Dorian "established the basis for proceeding with the dissolution of defendant, 545 South Second St. LLC," but did not order dissolution as Dorian requested in his third amended complaint. Because one claim in the complaint remained unresolved, this court sought supplemental briefing regarding appellate

9

On September 20, 2022, Defendants filed a timely notice of appeal.

## II. DISCUSSION

SJT and two of its members—Kamrin and Bock, both as individuals and as trustees of family trusts—argue that the trial court erred in granting Dorian's contract claim, in granting Dorian's breach of fiduciary duty claims, in calculating damages, in denying SJT's contract cross-claim, and in granting attorney's fees. We address each issue in turn.

### A. Dorian's Contract Claim

Defendants challenge the judgment on Dorian's contract claim primarily on the ground that Dorian lacks standing to enforce the Purchase Agreement upon which that claim is based. Among other things, Defendants argue that Dorian is not a party to the Agreement and that the Agreement expressly precludes claims by third-party beneficiaries. Because there is no material extrinsic evidence, we review the interpretation of the Purchase Agreement de novo. (*Parson v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865-866; *Bear Creek Master Assn. v. Southern California Investors, Inc*. (2018) 28 Cal.App.5th 809, 819.) As explained below, we agree with the Defendants that Dorian has no right to enforce the Purchase Agreement.

Dorian was a party to two agreements concerning the Briand Lots: the May 2016 Preliminary Agreement and the November Agreement. However, his contract claim against Defendants was not based on either of these agreements. (Indeed, Dorian alleged that the November Agreement was executed under duress and unenforceable.) Instead, Dorian's contract claim was based on the Purchase Agreement signed on August 12,

jurisdiction. In supplemental briefing, Dorian informed the court that granting dissolution and winding up Second Street LLC would "award him essentially nothing" and that there is "no unresolved action that prevents the judgment from being deemed final." Accordingly, we deem Dorian to have abandoned his dissolution claim in order to establish appellate jurisdiction. (*Ashland Chemical Co. v. Provence* (1982) 129 Cal.App.3d 790, 793.)

10

2016. Accordingly, when the trial court found a breach, it was a breach of "the August 12, 2016 Agreement."

Dorian is plainly *not* a party to the Purchase Agreement. The Purchase Agreement expressly identifies the parties to it. The Agreement states that it is "by and between (i) Kari Bowyer, solely in her capacity as the Chapter 7 Trustee of the estate of Briand Properties, LLC and (ii) San Jose Towers, LLC." The Agreement also states that "[t]he seller of the Property is Kari Bowyer, solely in her capacity as trustee ('Seller')," and refers to "San Jose Towers LLC ('Buyer')." Finally, the Agreement states that "[t]he Seller and Buyer are each a 'Party' and collectively the 'Parties.' "

Dorian is not identified as one of the parties to the Purchase Agreement, and while he is mentioned, the Agreement expressly distinguishes him from the parties. The Agreement mentions Dorian several times: It conditions the trustee's execution of the Agreement on approval by "Michael Dorian"; it requires SJT to enter into an agreement with "Mr. Dorian" to transfer title for the Briand Lots to a new limited liability corporation in which "Mr. Dorian" will have equal ownership and the right to receive 45 percent of net profits; and it requires the escrow agent to make a payment to "Mr. Dorian." Even more important, on its signature page the Purchase Agreement contains a representation from Dorian "to the Parties": "I, Michael Dorian, this 13th August 2016, represent and warrant *to the Parties* that (i) I have carefully reviewed this entire Agreement, (ii) I understand all of the terms and provision in the Agreement, and (iii) I unconditionally approve all of the terms and provision in this Agreement." (Italics added.) Thus, the Purchase Agreement is unequivocally clear that Dorian is not a party.

This is not to say that Dorian did not benefit from the Purchase Agreement. To the contrary, as just mentioned, the Agreement provided that he would receive a sizable payment ($345,000) from SJTs purchase of the Briand Lots, and it required SJT to transfer the Lots to a limited liability corporation that Dorian would half own and from which he would be entitled to 45 percent of the profits. Consequently, even though

11

Dorian was not a party to the Purchase Agreement, as Dorian recognized in his pleadings, he was "a third party beneficiary."

However, as a third-party beneficiary, Dorian had no right to enforce the Purchase Agreement. Third-party beneficiaries are permitted to enforce a contract only if doing so is "consistent with the objectives of the contract and the reasonable expectations of the contracting parties." (*Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 830.) Far from indicating that enforcement of third-party beneficiary claims is consistent with the expectation of the parties to the Purchase Agreement, the Agreement stated that "[t]he Parties intend that no third-party beneficiary shall have any rights or claims by reason of this Agreement." Consequently, Dorian cannot bring a third-party beneficiary claim under the Purchase Agreement. (See, e.g., *Ratcliffe Architects v. Vanir Construction Management, Inc.* (2001) 88 Cal.App.4th 595, 604 [third-party beneficiary claim precluded by contract stating that the agreement "creates no rights 'in persons not party to this Agreement, whether third party beneficiary, or otherwise' "].)

In nonetheless ruling that Dorian may enforce the Purchase Agreement, the trial court pointed to four factors: (1) Dorian signed the Agreement, (2) he was "a necessary signatory to the Agreement" and "unconditionally approve[d] all of the terms and provisions" of the Agreement, (3) he received a "legally enforceable benefit" and incurred a "legally binding obligation," and (4) the Agreement "does not limit enforcement . . . to individuals labeled 'buyer,' 'seller,' or 'party.' " None of these factors entitle Dorian to enforce the Purchase Agreement.

First, Dorian is not entitled to enforce the Purchase Agreement simply because he signed it. As Defendants note, non-parties frequently sign contracts. For example, a lawyer may sign a contract to approve it as to form and content—as, in fact, SJT's counsel did here. Moreover, even though he is not permitted to enforce the Purchase Agreement, there was good reason to require Dorian to sign and approve it. Because the trustee's duty to execute the Agreement was conditioned on Dorian's approval, Dorian's

12

signed approval of the Agreement removed any doubt whether that condition was satisfied. In addition, Dorian's signed approval gave the bankruptcy trustee some assurance that Dorian, owner of the debtor, was satisfied with the Agreement and would not later challenge it.

Second, it makes no difference that Dorian was a "necessary signatory" or " 'unconditionally approve[d]' " the terms of the Purchase Agreement. Contracts are frequently conditioned upon third-party approval. (See, e.g., *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 211-214 [agreement to enter joint venture conditioned upon obtaining financing from investors]; *Coe v. State Farm Mut. Automobile Ins. Co*. (1971) 66 Cal.App.3d 981, 993 [settlement agreement conditioned upon approval of compensation carrier]; *Santa Clara-San Benito etc. Elec. Contractors' Assn. v. Local Union No. 332* (1974) 40 Cal.App.3d 431, 436 [collective bargaining agreement conditioned upon approval by international union].) Nevertheless, Dorian fails to offer any authority or even reason for giving a non-party the right to enforce a contract merely because the contract is conditioned on the non-party's approval.

Third, the Purchase Agreement did not impose any legally binding obligation on Dorian. In concluding that the Agreement imposed such an obligation, the trial court pointed to a passage in the Agreement stating that "Dorian 'must unconditionally approve all terms and provisions of this Agreement.' " However, far from imposing any duty on Dorian, this passage conditioned several of the trustee's duties on Dorian's approval: "It is an express condition of the Seller's (i) execution of this Agreement and (ii) decision to seek Court approval of this Agreement, that Michael Dorian must unconditionally approve all terms and provisions of this Agreement." Citing section 21 of the Purchase Agreement, the trial court also determined that the Agreement required Dorian to represent that he had authority to sign it. In fact, section 21 was concerned with individuals signing the agreement on behalf of the *parties*: It stated that "[e]ach person signing this Agreement represents and warrants he/she has been duly authorized and has

13

authority to execute and deliver this Agreement on behalf of such *party* and bind her respective *Party(ies)* to the terms and conditions of this Agreement." (Italics added.)

Fourth, contrary to the trial court's determination, the Purchase Agreement did limit the ability of non-parties to enforce it: Indeed, as noted above, the Agreement expressly stated that "[t]he Parties intend that no third-party beneficiary shall have any rights or claims by reason of this Agreement."

The trial court also reasoned that prohibiting Dorian from enforcing the Purchase Agreement would "lead to an unfair result" because "Dorian would be barred from enforcing through a breach of contract action his entitlement to several things including 50% ownership in the contemplated LLC and 45% of the net profits." In fact, in the Preliminary Agreement Dorian, Kamrin, and Johnston agreed to form a new limited liability corporation in which Briand would own 50 percent and have a 45 percent share in the profits. In addition, the November Agreement between Dorian and SJT incorporated by reference the Preliminary Agreement and provided that Dorian would be substituted for Briand. Consequently, if Dorian had chosen to enforce the November Agreement and the Preliminary Agreement, he could have recovered the promised share in Second Street LLC's profits.

We therefore conclude that Dorian has no right to enforce the Purchase Agreement and that his claim for breach of that Agreement should be denied.

## B. Dorian's Fiduciary Duty Claims

In addition to challenging the judgment in favor of Dorian on his contract claim, Defendants challenge the judgment in favor of Dorian on his fiduciary duty claims. We agree in part. As explained below, we conclude that two of the defendants, Bock and Kamrin, did not owe Dorian any fiduciary duty. Conversely, we conclude that, as the managing member of Second Street LLC, SJT owed a fiduciary duty to Dorian as a member of the LLC, and that SJT breached this duty in some of the ways found by the trial court.

14

### 1. *Unclean Hands*

We begin by addressing Defendants' unclean hands defense, which the trial court rejected. Defendants assert that the unclean hands doctrine bars Dorian's fiduciary duty claims because Dorian failed to satisfy his duty under the November Agreement and the Second Street LLC operating agreement to turn over the excess funds remaining from Briand's bankruptcy after satisfaction of its debts. As the decisions cited by Defendants recognize, courts use a three-part test in applying the unclean hands doctrine. (See *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 979 ["Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries."]; see also *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 ["Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries."].) Because Defendants fail to discuss how this test applies here and merely assert without analysis or authority that the unclean hands doctrine applies, we deem their unclean hands argument abandoned. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 845 (*Phoenix*) [" ' "Contentions supported neither by argument nor by citation of authority are deemed to be without foundation and to have been abandoned." ' "].) As Defendants also assert without analysis or authority that the trial court should have required Dorian to elect between his contract and fiduciary duty claims, we deem that argument abandoned for the same reason.

### 2. *Duty*

In their reply brief, Defendants concede that SJT, as managing member of the Second Street LLC, owed a fiduciary duty to LLC members, which Dorian became in December 2016 when Haimson, as Dorian's trustee, signed the Second Street LLC

15

operating agreement.[2]  (See, e.g., *Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425 ["The manager of an LLC has a fiduciary duty and owes to the member of the LLC the same duties of loyalty and good faith as a partner to the partnership and its partners."].)  However, Defendants argue that Kamrin, Bock, and their family trusts, which were not LLC members, did not owe any fiduciary duty to Dorian.  We agree.

Fiduciaries assume special duties extending beyond those generally owed to others.  A fiduciary not only must exercise the reasonable care to avoid injury that is generally owed to others; it also assumes a "duty of undivided loyalty" (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 30 (*Wolf*)), which requires the fiduciary to "undertake to act on behalf of the beneficiary, giving priority to the best interest of the beneficiary" and using "the utmost good faith." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 222 (*Committee on Children's Television*).)  These stringent obligations are imposed only in limited situations.  " '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' "  (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386 (*City of Hope*).)  For example, fiduciary relationships are imposed as a matter of law upon certain established relationships "such as guardian and

---

[2] In their opening brief, Defendants asserted that Dorian never became a member of Second Street LLC because he did not give the Second Street LLC the excess funds from the bankruptcy and therefore did not make his initial contribution.  This assertion contradicts the plain language of the Second Street LLC operating agreement.  That agreement stated that the members of the LLC are "1.  San Jose Towers, LLC, 50%, [and] [¶] 2.  Al Haimson, Trustee for Michael Dorian, 50%" and that "Each *Member* shall make an Initial Contribution."  (Italics added.)  In other words, the operating agreement contemplated that initial contributions would be made after, not before, becoming a member.  In its reply and supplemental briefing, Defendants abandoned their prior position and stated that SJT "assume[d] a fiduciary duty toward Dorian when it entered into a special relationship with him, as the manager of . . . 545 Second Street LLC, after Dorian became a member on December 23, 2016."

ward, trustee and beneficiary, principal and agent, or attorney and client." (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271 see also Chodos, The Law of Fiduciary Duties (2000) §§ 1:6-1:18 [noting fiduciary duties are imposed on joint venturers, partners, corporate directors and officers, spouses, public officials, and class representatives].)  However, absent an established relationship imposing fiduciary duties, a fiduciary duty may be imposed only upon persons who "knowingly undertake to act on behalf and for the benefit of another." (*Committee on Children's Television*, *supra*, at p. 221.)

The trial court found that Kamrin and Bock owed Dorian fiduciary duties as "the product of three distinct, but interrelated documents": (1) the Purchase Agreement, (2) Second Street LLC's articles of organization, and (3) Second Street LLC's operating agreement.  It is well-settled, however, that contracts ordinarily do not create fiduciary relationships. (*City of Hope*, *supra*, 43 Cal.4th at pp. 386-392; see also *Wolf*, *supra*, 107 Cal.App.4th at pp. 30-31 ["the contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist"]; *Recorded Picture Co. v. Nelson Entertainment, Inc*. (1997) 53 Cal.App.4th 350, 370 ["the typical distribution contract, negotiated at arm's length, does not create a fiduciary duty relationship between the owner of the product and the distributor"]; *Waverley Productions, Inc. v. RKO General, Inc*. (1963) (217 Cal.App.2d 721, 732 ["A mere contract or a debt does not . . . create a fiduciary relationship."].)  Moreover, Dorian does not point to anything in the Purchase Agreement suggesting that Kamrin or Bock "knowingly undert[ook] to act on behalf and for the benefit" of Dorian. (*Committee on Children's Television*, *supra*, 35 Cal.3d at p. 221.)  Nor does Dorian identify anything in Second Street LLC's articles of organization or its operating agreement imposing fiduciary duties on Kamrin and Bock.  Indeed, neither Kamrin nor Bock was even a member of the Second Street LLC:  The members were SJT and Haimson, as Dorian's trustee.

17

Citing *Hasso v. Hapke* (2014) 227 Cal.App.4th 107 (*Hasso*) and *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315 (*Cleveland*), Dorian contends that a fiduciary duty may arise when one person enters into a confidential relationship with another. However, the cases cited by Dorian involved relationships between an investment advisor and its client (*Hasso*, *supra*, at pp. 140-141) and between the promoter of a corporation and a pre-incorporation investor (*Cleveland*, *supra*, at pp. 1337-1338). Dorian does not suggest that his relationship with Kamrin and Bock bears any similarity to those relationships. In fact, Dorian does not even explain why his relationship with Kamrin and Bock should be considered confidential. Consequently, Dorian fails to offer any persuasive ground for imposing fiduciary duties on Kamrin and Bock.

Accordingly, we conclude that SJT owed Dorian a fiduciary duty as a member of the Second Street LLC, but that Kamrin and Bock did not owe him any fiduciary duty and that Dorian's fiduciary duty claims against Kamrin and Bock and their family trusts should be denied.

### 3. Breach

The trial court found that SJT breached its fiduciary duty to Dorian in six ways. We consider each below.

#### a. Creation of Second Street LLC

The trial court found that SJT breached its fiduciary duty to Dorian by not immediately creating a limited liability corporation as required by the Purchase Agreement. In fact the Agreement required SJT, "immediately after" acquiring the Briand Lots, to enter into an agreement with Dorian to transfer title to the Lots to a new limited liability corporation. As the deed conveying title to the Brand Lots was not recorded until November 2, 2016, SJT arguably satisfied its duty by entering into the November Agreement two weeks later. In any event, Second Street LLC was formed in October 2016, and Dorian did not become a member of the LLC until December 20, 2016 when Haimson, acting as Dorian's trustee, signed the Second Street LLC operating

18

agreement. Dorian has not shown that SJT owed him any fiduciary duty before he became a member of Second Street LLC, much less before SJT became Second Street LLC's managing member, that SJT could have breached by not forming the Second Street LLC until October 2016.

b. The November Agreement and the Trust

The trial court also found that SJT breached its fiduciary duty to Dorian by drafting the November Agreement, which "greatly benefitted [it] to the disadvantage of Dorian," and also by forming a trust on Dorian's behalf in a document not shared with him. However, the November Agreement was executed on November 15, 2016, and the trust necessarily was formed sometime before Haimson, as trustee, signed the Second Street LLC operating agreement. As a consequence, both actions occurred before Dorian became a member of Second Street LLC and therefore before SJT, as managing member, owed him a fiduciary duty.

c. Delay in Transferring the Briand Lots

The trial court found that SJT breached its fiduciary duty to Dorian by not transferring the Briand Lots to Second Street LLC until November 2018, after Dorian filed a lis pendens and a full two years after the bankruptcy trustee transferred the Lots to SJT. As this failure continued long after Dorian became a member of the LLC in December 2016, SJT does not dispute that it owed a fiduciary duty to Dorian during the relevant time period or that it breached this duty by failing to transfer the lots for two years. Instead, SJT argues that the trial court found that Dorian failed to prove that he incurred attorney's fees or costs in bringing the lis pendens and therefore Dorian failed to prove that he was injured by SJT's delay in transferring the Briand Lots.

Dorian responds that he incurred attorney's fees in filing the lis pendens. However, as SJT pointed out, the trial court found that Dorian failed to prove that he incurred such fees, and Dorian admittedly has not cross-appealed that finding, much less shown it unsupported by substantial evidence. Nor has Dorian argued that he suffered

19

any other cognizable harm. Consequently, we conclude that Dorian failed to show that he suffered any injury from the delay in transferring the Briand Lots.

e. Concealment

The trial court's fifth ground for finding breach of fiduciary duty was that SJT concealed an attempted sale to a company named Knowhere and the ultimate sale to Urban Community as well as generally failing to provide Dorian with information about the working of Second Street LLC. However, Dorian brought a separate cause of action for concealment of this information, which the trial court denied because it found that Dorian failed to show reliance. As Dorian has not cross-appealed this finding, he cannot show that he suffered any injury caused by SJT's alleged concealment and therefore cannot show breach of fiduciary duty based on such concealment.

f. Distribution of Profits

The trial court's final ground for finding breach of fiduciary duty was SJT's failure to distribute proceeds from Urban Community's purchase of the project containing the Briand Lots. SJT argues that it was not required to make a distribution because 545 Second Street LLC has not made any net profit. We disagree.

SJT's main argument is that the trial court miscalculated Second Street LLC's revenue from Urban Community's purchase. The trial court determined that Second Street LLC's revenue from the purchase was $22.5 million and that the portion attributable to the Briand Lots was $7.29 million. SJT argues that the trial court should not have treated the entire $22.5 million purchase price as revenue because Urban Community did not pay the entire price in cash. Instead, Urban Community provided about $13.7 million in cash and a promissory note, with a one-year period and two extensions, for the remainder. SJT contends that this note should not be treated as revenue in calculating Second Street LLC's net profits. However, SJT does not point to any evidence that Urban Community was unlikely to pay the promissory note when it came due or that interest on the note will fail to compensate SJT for delay in receiving

20

the funds.  Nor does SJT offer any reason why, absent such evidence, the promissory note should not be considered in calculating net profits.  As a consequence, it was reasonable to infer that the note would be paid, and the trial court's treatment of the note as revenue must be upheld.  (See *Rony v. Costa* (2012) 210 Cal.App.4th 746, 754 [in determining whether a damages award is supported by substantial evidence, courts " ' "consider the evidence in the light most favorable to the judgment, accepting every reasonable inference" ' "]; *Toscana v. Green Music* (2004) 124 Cal.App.4th 685, 691 ["The evidence is insufficient to support a damage award only when no reasonable interpretation of the record supports the figure."].)

SJT also contends that the trial court miscalculated the costs attributable to the Briand Lots in attributing only $215,591 in costs to the Lots.  In particular, SJT contends that the trial court also should have attributed the $3.64 million paid for the Lots.  We agree.  The November Agreement incorporated by reference the Purchase Offer, which in turn states that the net profits from the Briand Lots "shall be determined by subtracting all costs attributed to the subject parcels, including the . . . purchase price."  As explained below, we conclude that the November Agreement is enforceable.  Consequently, under the plain language of the Purchase Offer the $3.64 million paid to purchase the Briand Lots must be treated as costs attributable to the Lots and subtracted in calculating Second Street LLC's net profits.

SJT contends as well that the trial court should have attributed an additional $1.73 million in costs to the Briand Lots, including over $1.45 million in repayments to investors and approximately $200,000 in taxes.  Although SJT contends that Dorian admitted these costs, in fact Dorian merely admitted that the interest paid on a loan for a piece of property may be a holding cost, not that the repayments and back taxes in question are attributable to the Briand Lots.  Moreover, SJT has not offered any further argument concerning the claimed costs.  Accordingly, we deem SJT's contention

21

concerning the additional $1.73 million in costs to be forfeited. (*Phoenix*, *supra*, 47 Cal.4th at p. 845.)

In sum, while SJT has shown that the trial court should have attributed to the Briand Lots $3.64 million in costs in addition to the approximately $216,000 it found, in light of the $7.29 million in revenue attributable to the Lots, Second Street LLC nonetheless realized net profits attributable to the Lots. We therefore conclude that substantial evidence supports the trial court's determinations that Dorian was injured and SJT breached its fiduciary duty by failing to distribute net profits to Dorian.

### 4. *Damages*

Because the trial court failed to include the $3.64 million paid to acquire the Briand Lots in its calculation of net profits, it miscalculated the net profits that should have been distributed to Dorian and the consequent damages suffered by Dorian. Accordingly, we vacate the damages award to Dorian on his fiduciary duty claim against SJT and remand for further consideration of the issue of damages. (See *Ajaxo Inc. v. E*Trade Financial Corp.* (2010) 187 Cal.App.4th 1295, 1312, fn. 10.)

### C. **SJT's Contract Cross-Claim**

In addition to awarding Dorian damages on his contract and fiduciary duty claims, the trial court denied SJT's cross-claim against Dorian for breach of the November Agreement. The trial court held the November Agreement unenforceable on the grounds that it improperly attempted to modify the Purchase Agreement, violated the Purchase Agreement's superseding clause, and lacked consideration. As explained below, we disagree.

### 1. *Modification*

The trial court ruled the November Agreement unenforceable on the ground that it impermissibly sought to modify the Purchase Agreement. However, the Purchase Agreement was between SJT and the bankruptcy trustee. By contrast, the November Agreement was between SJT and Dorian, not the bankruptcy trustee. As a consequence,

22

the November Agreement did not—and could not—modify the duties that SJT and the bankruptcy trustee owed to each other under the Purchase Agreement.

Indeed, the Purchase Agreement contemplated that SJT would enter into a separate agreement with Dorian. Section 4 of the Purchase Agreement stated that, as the Buyer, SJT "is obligated to enter into a binding, separate agreement with Mr. Dorian" to transfer the Briand Lots to a new limited liability corporation in which Dorian would have 50 percent ownership and a 45 percent share of the profits. The November Agreement did not impermissibly modify the Purchase Agreement by realizing the agreement contemplated by the Purchase Agreement.

Dorian also argues that the November Agreement improperly modified the Preliminary Agreement and the Purchase Offer. However, the November Agreement could not have modified the Purchase Offer because, by November 2016, there was no enforceable Purchase Offer to modify, as the Purchase Agreement expressly superseded all prior agreements concerning the Briand Lots between SJT and the bankruptcy trustee, the parties to both the Purchase Offer and the Purchase Agreement. In addition, the November Agreement could not have modified the Preliminary Agreement because, while the November Agreement was between Dorian and SJT, the Preliminary Agreement was between three different parties: Johnston, Kamrin, and Briand (albeit with Dorian signing on behalf of Briand). In any event, far from precluding modification, the Preliminary Agreement stated that it was "to be used as the basis for a final version of this contract."

### 2. *The Superseding Clause*

The trial court also ruled that the November Agreement violated the Purchase Agreement's superseding clause by incorporating agreements prior to the Purchase Agreement. However, the superseding clause states only that the Purchase Agreement "supersedes all prior agreements and constitutes the entire agreement *between the Parties*." (Italics added.) As shown above, the Agreement identified the " 'Parties' " as

23

SJT and the bankruptcy trustee.  By contrast, the November Agreement was between SJT and Dorian.  The Purchase Agreement's superseding clause therefore did not apply to the November Agreement.

### 3.  *Consideration*

The trial court ruled that the November Agreement was not supported by consideration because it did not provide Dorian with any benefit not already conferred by the Purchase Agreement.  This ruling implicitly assumes that the Purchase Agreement was enforceable by Dorian, which, as explained above, is incorrect.  Consequently, the November Agreement provided Dorian with something new and valuable:  By incorporating the terms of the Preliminary Agreement and the Purchase Offer, the November Agreement gave Dorian the right to enforce the terms of those agreements concerning Dorian's ownership interest in Second Street LLC and share in its profits.

### 4.  *Incorporation by Reference*

Dorian's final argument against SJT enforcing the November Agreement is that the agreement impermissibly incorporated by reference the Preliminary Agreement and the Purchase Offer.  There is, however, nothing impermissible about incorporating another contract by reference.  To the contrary, as Dorian observes, it has long been recognized that a contract may incorporate another document by reference if three requirements are satisfied: " '[(1)] the reference must be clear and unequivocal, [(2)] the reference must be called to the attention of the other party and he must consent thereto, and [(3)] the terms of the incorporated document must be known or easily available to the contracting parties.' [Citation.]" (*Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 641, italics omitted.)  The November Agreement satisfied these requirements.  First, the agreement clearly and unequivocally stated that the Preliminary Agreement and the Purchase Offer are "incorporated by reference herein."  Second, these provisions called Dorian's attention to the Preliminary Agreement and the Purchase Offer, and by signing the November Agreement he consented to incorporating them.

24

Third, the terms of the Preliminary Agreement and the Purchase Offer were known to Dorian because he signed the Preliminary Agreement on behalf of Briand and averred in a declaration submitted to the Bankruptcy Court that he had reviewed and approved the Purchase Offer.

On appeal, Dorian asserts additional objections to incorporation: the November Agreement sought to incorporate "new, modified agreements"; the November Agreement sought to incorporate only some parts of the Preliminary Agreement and the Purchase Offer; he was not provided with new or amended versions of the Preliminary Agreement or the Purchase Offer showing exactly which terms were being incorporated; and the Purchase Offer was never executed. However, Dorian fails to support any of these objections with legal argument or authority, and therefore we treat them as abandoned. (*Phoenix*, *supra*, 47 Cal.4th at p. 845.)

Accordingly, we conclude that the November Agreement properly incorporated by reference the Preliminary Agreement and the Purchase Offer.

### 5. *Enforceability and Breach*

Because the trial court concluded that the November Agreement was invalid and unenforceable, it did not consider whether Dorian breached that agreement. SJT asks that we find on appeal that Dorian breached the November Agreement because undisputed evidence shows that he failed to transfer the excess funds he received from the Briand bankruptcy. While the evidence supports this conclusion, at the end of the first phase of the trial the court made a "comment" that several portions of the November Agreement are unconscionable. Especially as such a defense might impact the availability of prejudgment interest, we remand to the trial court to consider whether Dorian's duty under the November Agreement to transfer excess funds to Second Street LLC was enforceable, whether that duty was breached, and, if so, whether SJT suffered damages.

25

**D. Attorney's Fees and Costs Award**

The trial court awarded Dorian attorney's fees and costs under a provision in the Purchase Agreement stating that, in the event of a breach, "the non-breaching Party shall be entitled" to fees and costs. In light of our determination that Dorian is not entitled to sue for breach of the Purchase Agreement, he is not entitled to attorney's fees under that provision. We therefore vacate the award of attorney's fees and costs to Dorian under the Purchase Agreement. On remand, the trial court may consider whether either Dorian or the Defendants are entitled to attorney's fees or costs on other grounds.

## III. DISPOSITION

The May 27, 2022 judgment is reversed. The judgment in favor of Michael Dorian on his third amended complaint and the judgment in favor of Michael Dorian and Briand Properties, LLC on the first amended cross-complaint of San Jose Towers, LLC and 545 South Second Street, LLC are reversed. The judgment awarding attorney's fees and costs to Michael Dorian is also reversed.

The matter is remanded to the trial court with directions (1) to enter judgment in favor of San Jose Towers, LLC, Gregory Bock, the Bock Family Trust, Arnold Kamrin, and the Kamrin Family Trust on Michael Dorian's breach of contract cause of action; (2) to vacate the damages awarded to Michael Dorian on his breach of fiduciary duty cause of action; (3) to vacate the judgment in favor of Michael Dorian on cross-claimant San Jose Tower, LLC's breach of contract cause of action; and (4) to hold further proceedings consistent with this opinion on Dorian's breach of fiduciary duty cause of action and on cross-claimant San Jose Tower, LLC's breach of contract cross-claim.

Appellants are entitled to recover reasonable costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

26

_____

BROMBERG, J.

WE CONCUR:

_____

GROVER, ACTING P. J.

_____

LIE, J.

*Dorian et al. v. San Jose Torres, LLC, et al.*
H050432